PACIFIC AEROSPACE & ELECTRONICS, INC., a Washington corporation, Plaintiff,

v.

Edward TAYLOR, an individual; Kristen Taylor, an individual; James Petri, an individual; Raad Technologies, Inc., a Washington corporation; Defendants.

No. CS–02–0412–AAM.

United States District Court, E.D. Washington.

June 20, 2003.

**1190**

Harry J.F. Korrell and Douglas J. Morrill of Davis Wright Tremaine LLP, Seattle, WA, for plaintiff.

John W. Beuhler, Jr., Wenatchee, WA, Janyce L. Fink, Esq., Seattle, WA, for defendants.

## ORDER GRANTING PLAINTIFF'S PRELIMINARY INJUNCTION

MCDONALD, Senior District Judge.

### I. INTRODUCTION

In 1994, Congress amended the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), the application of which this case will confer jurisdiction on the district court for one of plaintiff's claims. Plaintiff, an engineering and manufacturing corporation, seeks to assert the revised provisions of the CFAA as private rights of action against the defendants. Resolving any perceived ambiguities in the legislation in plaintiff's favor, the court by this Order concludes that plaintiff has stated a claim under federal question jurisdiction and has pled a claim under the revised CFAA.

The jurisdictional issue is examined first, followed by a discussion of plaintiff's motion for preliminary injunction and defendants' opposition to such motion.

### II. PROCEDURAL HISTORY AND BACKGROUND

Plaintiff Pacific Aerospace & Electronic, Inc. ("PAE") filed this complaint for injunctive relief on November 27, 2002 alleging federal question jurisdiction on the basis of the Computer Fraud and Abuse Act[1]. On February 18, 2003, after court-ordered expedited discovery was conducted, plaintiff filed a motion for preliminary injunction (Ct.Rec.30), which was originally set for hearing without oral argument on March 17, 2003. On March 4, 2003, defendants filed their response to the motion and oral argument was set for May 12, 2003 before Chief Judge Van Sickle, the judicial officer to whom this matter was originally assigned.

On March 10, 2003, plaintiff filed a reply in support of its preliminary injunction motion along with a separate "Opposition and Objection" to what plaintiff labeled a "Motion to Dismiss or Transfer" found in defendants' response brief[2]. On April 15, 2003, Chief Judge Van Sickle recused himself from this matter and reassigned the case to the undersigned. On May 1, 2003, defendants filed a motion for "leave to submit supplemental opposition pleadings re: motion for preliminary injunction." This supplemental opposition[3], consisting of a 114–page "Supplemental Statement of Material Facts, Evidence and Key Admissions Re: In Opposition To Plaintiff's Mo-

---

1. The plaintiff's complaint also alleges breach of contract, breach of common law duties regarding ownership of inventions, tortious interference, unfair competition, misappropriation of trade secrets, civil conspiracy, and conversion. (Ct.Rec.1).

2. Defendants' response brief urges the court to dismiss plaintiff's complaint or alternatively to transfer this case to the United States District Court, Western District of Washington, for consolidation with defendants' pending Declaratory Judgment suit (RAAD Technologies, Inc. v. Pacific Aerospace & Electronics, Inc., Case No. CV03–0329Z).

3. This document appears to be a hybrid brief and statement of material facts, mostly consisting of quotes selected from deposition testimony, in contradiction to LR 56.1.

tion For Preliminary Injunction", was based on recently taken depositions. In reaction to defendants' supplemental filing, the court, through its "Order Re Motion For Preliminary Injunction" of May 6, 2003: granted defendants' motion for leave to file supplemental opposition pleadings; set defendants' response date for May 23, 2003; vacated the oral hearing of May 12, 2003; and scheduled an oral hearing for June 10, 2003.

## III. FACTS

PAE designs and manufactures hermetically-sealed connectors and housings for its customers' highly sensitive electronic circuitry in the commercial and military aerospace, space exploration, defense electronics and weapons systems, medical implants, communications, and geotechnology industries. (Complaint, ¶¶ 9, 10, 11). PAE, with its principal place of business in Wenatchee, Washington, is comprised of three divisions: Aerospace Components (U.S.), Aerospace Components (Europe), and Electronic Components (U.S.). (Complaint, ¶¶ 1,9).

PAE's chief executive officer Don Wright testified that the specialized and customized nature of PAE's business made the identity of the relatively small numbers of engineers who required its products especially crucial to its business success. (Wright Decl., ¶ 17). As a result, he concluded, knowing the identity and needs of these engineers was an extremely valuable aspect of PAE's business and prospective business and one that would have been very difficult for any company to derive on its own. (Wright Decl., ¶¶ 18, 19, 21).

Defendant Edward Taylor ("Taylor") was employed at PAE as Vice President for Engineering and Technology in its Wenatchee, Washington office from July 1, 1991 to August 22, 2002 [4]. (Complaint, ¶ 17). Taylor was responsible for inventing and selling, and typically wrote several patents per year on behalf of PAE. *Id.* By virtue of his position, Taylor was given access to proprietary information concerning PAE's processes, technologies, confidential business information, client and prospective customer lists and information. (Complaint, ¶¶ 17–19). The client information contained in the database which Taylor had access to included company names, contact names, phone and fax numbers, and more particularized information relating to the specific client's needs, projects, and purchases. (Complaint, ¶ 19).

In 1994, Taylor signed an Invention and Confidential Information Agreement in which he agreed to maintain the confidentiality of PAE's information and to assign to PAE any rights to inventions made or conceived during his employment at PAE. (Complaint, ¶ 20). This agreement specifically lists the information PAE prohibited their employees from disclosing:

> ... concepts, processes, techniques, specifications, drawings, instructions, research, ... customer lists, supplier identity, marketing and sales plans, forecasts, computer data, financial information, costs, data, pricing information and all other information, concepts or ideas involving or reasonably related to the business or prospective business of the Company.

In 1997, Taylor signed an Employment Agreement providing him employment for a specific term of three years. (Complaint, ¶ 21; Taylor Dep., Exh. 37). Through Article 5.1 of this agreement, Taylor committed to maintain the secrecy of and not to use or disclose PAE's confi-

---

**4.** It is disputed by the parties whether Mr. Taylor resigned or was terminated from his job at PAE.

dential and proprietary information, including customer information, except as authorized by the company and for its benefit. Taylor also agreed to assign the rights of any inventions conceived during his employment which relate to the company's business. *Id.* Article 5.2 of the Employment Agreement prohibited Taylor's solicitation of any PAE employee or interference with any employment relationship between PAE and its employees for a period of two years after the expiration of the contract term. (Complaint, ¶ 22). Article 5.2 reads, in pertinent part:

> The Employee agrees that during the Contract Term and for a period of two years after the expiration of the Contract Term ..., he will not (i) directly or indirectly solicit, induce, or encourage any employee of the Company to leave his or her employment with the Company or interfere with any employment relationship between the Company and any of its employees, (ii) hire or encourage or assist any other person to hire any person who has been an employee of the Company within the previous three months, or (iii) have any contact, directly or indirectly, with any customers of the company.

Taylor's Employment Agreement was renewed on May 31, 2000 for an additional two year term. (Complaint, ¶ 21, Taylor Dep., Exh. 37). Taylor specifically acknowledged in this agreement that a breach would cause PAE irreparable harm, and Taylor agreed that an injunction would be a permissible remedy [5].

Defendant James Petri ("Petri") was employed by PAE as the Engineering Manager in its Wenatchee offices from June 13, 1994 to August 22, 2002, when he resigned. (Complaint, ¶ 23). In this posi-tion, Petri was responsible for development of technology, process development, and mechanical design. *Id.* Like Taylor, Petri had access to PAE's proprietary information about the company's business and intellectual property. (Complaint, ¶ 24). And like Taylor, Petri signed an Invention and Confidential Information Agreement. (Complaint, ¶ 24).

Defendant Kristen Taylor [6] ("Mrs. Taylor"), Defendant Taylor's wife, was employed as a Document Control Clerk with PAE in its document control department from April 1990 until she resigned on September 6, 2002. (Complaint, ¶ 26). As a requirement of her position, Mrs. Taylor, then using her maiden name Kristen Cotton, also signed an Invention and Confidential Information Agreement. *Id.*

Defendant RAAD Technologies, Inc. ("RAAD") is an engineering and manufacturing company formed to allegedly compete with PAE in approximately the same time frame that Defendants Taylor and Petri left PAE in August 2002. (Ct. Rec. 34, at page 3). RAAD is engaged in a business targeted towards the same particular niche market as PAE. RAAD designs, manufactures and sells hermetically-sealed connectors and housings for use with highly sensitive electronic circuitry in the aerospace and high tech industries. (Arena Dep. at page 9).

PAE presents evidence that Taylor, in contemplation of leaving PAE, met with potential investors, Edward Worrall and Jack Jones, in late May or early June 2002, approximately two months before Taylor and Petri left PAE, to discuss and evaluate a proposed manufacturing corporation that would make products similar to Taylor's employer at the time, PAE. (Wor-

---

**5.** Attachment 1 to Defendants' Motion for Preliminary Injunction, §§ 41–43, filed under seal pursuant to § F of the Court's Protective Order.

**6.** Mrs Taylor's activities are not the subject of PAE's preliminary injunction motion. (Ct. Rec. 34 at page 3, note 2).

rall Decl., ¶¶ 2,4). Mr. Worrall had several concerns (possible violation of Taylor's employment agreement, overly optimistic business forecast, Taylor's new ideas may belong to PAE, and the need for a license from PAE) and told Mr. Jones that he would not invest and didn't think Mr. Jones should either. (Worrall Decl.¶¶ 5–8).

On August 22, 2002, according to PAE's version of the facts, Taylor, Petri, PAE's president Lew Wear and PAE's CEO Don Wright met to discuss Taylor's decision [7] to leave PAE and restrictions on his post-employment conduct imposed by his employment agreement. (Wear Decl., ¶ 24). At that meeting, according to Wear, Taylor told Wear and Wright that he had refrained from telling PAE about his ideas for inventions he had conceived in the past year or two at PAE because he wanted to use the inventions for his own purposes after leaving PAE. (Wear Decl., ¶ 27). Wear further testifies that Petri stated he was going with Taylor and both Taylor and Petri announced they would be joining RAAD Industries. (Wear Decl., ¶¶ 25, 26). Taylor allegedly boasted that "we'll put you out of business in a few years." (Wear Decl., ¶ 26).

After leaving PAE, defendant Petri joined RAAD Industries, a machine shop in Wenatchee, Washington, co-owned by Rodney Arena [8] and Darrell Anderson, and RAAD Technologies, Inc. (RAAD) was formed [9]. Petri is a part owner of RAAD and is in charge of sales, design, and quality assurance. (Petri Dep. at page 6). The other owners of RAAD are Darrell Anderson and Rodney Arena. (Arena Dep., Vol. I at pp. 6–7). RAAD currently has three employees: Mrs. Taylor, Nicole Tolley, and Andy Northwind. (*Id.* at pp. 7–8). While the defendants claim that Taylor is not employed by RAAD and only performs "consulting" for RAAD, Taylor maintains an office at RAAD, has keys to RAAD offices, receives assistance from RAAD staff, uses RAAD equipment and computers, designs new tools for RAAD, and regularly consults with RAAD regarding design ideas, quotations to customers, and uses the collective pronoun "we" when referring to RAAD, as indicated on design sketch notes. (Ct. Rec. 34 at page 3).

Shortly after leaving PAE, Taylor and Petri allegedly, in violation of their agreements with PAE, compiled a list of prospective customers for RAAD from their memories and business card file Taylor retained when he left. (Ct. Rec. 34 at page 12). That compiled list was then given to Mark Kline, RAAD's new sales representative, for his use in soliciting business for RAAD. (Petri Dep. at pp. 55–58; Taylor Dep. at pp. 60–61).

PAE argues, and the undisputed facts indicate, that when Taylor and Petri left PAE to join RAAD Industries and subsequently form defendant RAAD Technologies, Inc., RAAD changed its focus from precision continuous numerically controlled (CNC) machining to the customized products (hermetically sealed connectors and packaging assemblies) produced by PAE. (Arena Dep., Vol. I, at page 9). In doing so, PAE asserts, RAAD began to target

---

7. The parties dispute exactly how Taylor's employment ended. According to Taylor, he requested changes at PAE, i.e. changes in the connector division management, to keep him interested in staying at PAE. PAE refused to make the requested changes and then fired him, according to Taylor. (Taylor Dep. at pp. 31–36). PAE contends that Taylor resigned. (Wear Decl., ¶ 24).

8. Rodney Arena was also a former employee of Pacific Aerospace. Mr. Arena worked at Pacific Aerospace for six years, leaving in 1997. (Arena Dep. Vol. II at pp. 108–09).

9. (Arena Dep., Vol. I at page 9).

**1194**

PAE's customer base. PAE asserts that before Petri and Taylor left PAE, they began calling the client contacts they had developed while at PAE, asking that they leave PAE to do business with RAAD. In doing so, PAE alleges that RAAD offered these clients replacement products (some allegedly slightly modified or improved designs that were more "cost-effective") for products Taylor and Petri sold them while at PAE. (Ct. Rec. 34 at pp. 14–15).

## IV. DISCUSSION

### A. Federal Question Jurisdiction: Does the CFAA prohibit the conduct complained of in the complaint?

■ Questions regarding the existence of federal question under the CFAA (18 U.S.C. § 1030) have begun to surface as courts contend with the specific purview of the Act. One court, in *Miles v. America Online, Inc.*, 202 F.R.D. 297, 300 (M.D.Fla. 2001), held that a federal question claim based on alleged violations of the CFAA would not be dismissed for lack of subject matter jurisdiction where the claim did not appear to be immaterial and made solely for the purpose of obtaining jurisdiction, or to be wholly insubstantial and frivolous.

The defendants argue that PAE's claim does not fall within the ambit of the CFAA, and the case should be dismissed for lack of federal jurisdiction. The court rejects this contention and finds that PAE has alleged a claim under the CFAA.

### 1. History of the CFAA

A host of new and novel legal issues have arisen due to the growth of computer availability and application. In 1984, in response to the growing wave of computer crime, Congress enacted the first version of the CFAA as the "Counterfeit Access

Device and Computer Fraud and Abuse Act[10]"—the first federal computer crime statute ("1984 Act").[11] This legislation protected only a relatively narrow class of government operated computers as Congress was reluctant to preempt or interfere with the local and state computer crime authorities. *Id.* The 1984 Act made it a felony to knowingly access a computer without authorization in order to obtain classified defense information with the intent that such information would be used to harm the United States. *Id.* In addition, the 1984 Act made it a misdemeanor to knowingly access a computer without authorization in order to obtain information in a financial record of a financial institution or in a consumer file of a consumer reporting agency, or to use, modify, destroy, or disclose information in a computer operated on behalf of the United States if such conduct would affect the government's use of the computer. *Id.* The 1984 Act had a couple of loopholes, or scenarios not accounted for: 1) authorized persons causing harm to protected computer systems; and 2) unauthorized persons who gave codes or software to authorized persons who loaded them into their computers. *Id.*

Two years later, Congress amended the 1984 Act by creating the 1986 Computer Fraud and Abuse Act (1986 Act). *Id.* The amendment eliminated some of the 1984 Act's confusing language, defined additional terms, and expanded the scope of the 1984 Act. *Id.* The expansion of computer crimes was three-fold: 1) a computer fraud offense patterned after the federal mail and wire fraud statutes; 2) an offense for the alteration, damage or destruction of information contained in a "federal interest computer;" and 3) an offense for the traf-

---

**10.** Pub.L.No. 98–473, 98 Stat. 2190.

**11.** Mark R. Colombell, Note, *The Legislative Response to the Evolution of Computer Viruses,* 8 RICH.J.L. & TECH. 1 (2002).

ficking of unauthorized computer passwords in certain circumstances [12].

Eight years later, in 1994, Congress again amended the 1986 Act to broaden the federal law as it related to computer "worms" and "viruses." [13] The 1994 Computer Abuse Amendments Act (1994 Act) was actually the smaller part of a more comprehensive omnibus crime bill titled "The Violent Crime Control and Law Enforcement Act of 1994" which President Clinton signed into law on September 13, 1994. *Id.* The pre–1994 Act provided only criminal penalties. The 1994 Act added civil remedies, 18 U.S.C. § 1030(g), that allowed any person who suffered damage by a statutory violation to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *Id.*

Specifically, three changes were made to section 1030(a)(5) of the 1986 Act: 1) coverage was expanded to include computers used in interstate commerce; 2) the requirement of an "unauthorized access" was removed which meant that company insiders and authorized users could be held liable; and 3) certain types of reckless conduct and intentional acts were deemed criminal. *Id.*

Because Congress determined that the scope of the 1994 Act was still too limited, Senators Leahy, Kyl and Grassley along with Representatives McCollum, Schumer and Hamilton sponsored an amendment to the 1994 Act titled the National Information Infrastructure Protection Act (NIIPA) of 1996. *Id.* On October 11, 1996, President Clinton signed into law the NIIPA of 1996, which was enacted under the same bill (H.R.3723) as the Economic Espionage Act of 1996. *Id.* The purpose of this amendment was to include computers in the private sector (called protected computers) as well as those under government domain [14]. One of the 1996 amendments deleted the phrase "through means of a computer used in interstate commerce or communications" found in the 1994 Act's version of 18 U.S.C. § 1030(a) [15]. Today, a claimant may establish a civil cause of action under the CFAA by demonstrating that a person has (i) "knowingly and with intent to defraud," (ii) accessed a "protected computer," (iii) "without authorization," and as a result (iv) has furthered the intended fraudulent conduct and obtained "anything of value." 18 U.S.C. § 1030(a)(4).

Congress has, therefore, continuously broadened the scope and coverage of the CFAA since its original enactment in 1984. And no doubt, as new forms of computer crimes emerge, the CFAA will continue its evolution as courts construe and apply particular provisions of the statute.

2. **Caselaw Supports An Employer's Use of the CFAA's Civil Remedies To Sue Former Employees and Their New Companies Who Seek A Competitive Edge Through Wrongful Use of Information From the Former Employer's Computer System.**

Companies frequently find themselves in litigation with former employees who de-

---

12. 174 A.L.R. Fed. 101, 2001 WL 1529757 (2001).

13. Mark R. Colombell, Note, *The Legislative Response to the Evolution of Computer Viruses*, 8 RICH.J.L. & TECH. 1 (2002).

14. 174 A.L.R. Fed. 101, 2001 WL 1529757 (2001).

15. The court in *Shaw v. Toshiba America Information Systems, Inc.*, 91 F.Supp.2d 926 (E.D.Tex.1999) suggested this deletion arguably removed the need for computer-to-computer transmission.

part to set up shop elsewhere in competition with their former employer. Such former employees may attempt to gain an edge for their new venture by making use of proprietary information, such as customer lists or trade secrets, obtained with ease of access from their former employer's computer database or workstations that are linked together in a network. While passwords and other electronic means can limit the unauthorized dissemination of some confidential information, an employee who has not yet announced his departure is still able to access confidential information and store it on a CD or floppy disk before he or she leaves. Computers also make it easy for employees to quickly transmit information out of the company via e-mail.

Since the last amendment of the statute, the majority of CFAA cases still involve "classic" hacking activities.[16] Employers, however, are increasingly taking advantage of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system. A recent federal district court case in the Western District of Washington, *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121 (W.D.Wash.2000) explicitly recognized that Congress's 1994 amendment of the CFAA was intended to expand the statute's scope to include civil claims challenging the unauthorized removal of information or programs from a company's computer database.

*Shurgard* involved a dispute between a self-storage business and its competitor for alleged damage to its computers arising from the competitor's alleged receipt from former employees of trade secret information obtained in violation of the CFAA. It was further held that a damage claim was stated even though the misappropriation did not affect the integrity of the trade secrets within the employers' computers (information remained intact). Further, it was found that the employer suffered loss in the form of expenses incurred in modifying its computers to preclude further unauthorized data transfer.

A First Circuit case, providing guidance as to the elements necessary for a successful CFAA claim in the employer-employee context, is *EF Cultural Travel BV, EF v. Explorica, Inc.,* 274 F.3d 577 (1st Cir. 2001). In *Explorica,* the appellate court clarified what constituted "unauthorized access" to a plaintiff's computer database. The plaintiff, a tour company, sued a competitor company that had hired a group of it's former employees. The defendant tour company began competing with plaintiff in the market for student travel tours around the time plaintiff's former employees had joined defendant. Defendant was accused of having a "scraper" computer program designed to obtain pricing information automatically from plaintiff's website.

The First Circuit in *Explorica* affirmed a finding by the district court that although the use of the program itself did not invade or impair the plaintiff's computer system, the use of the scraper program was "unauthorized access" in violation of the CFAA. The First Circuit further held that the program's effectiveness was dependent on knowledge obtained by the ex-

---

**16.** See *YourNetDating, Inc. v. Mitchell,* 88 F.Supp.2d 870 (N.D.Ill.2000), a hybrid hacker:employer-employee case where an Internet dating service used the CFAA to prevent a former employee from interfering with the company's computer database and servers.

The former employee hacked into the company's website so that individuals browsing the site were diverted against their will to a pornographic site which just happened to be the ex-employee's new company.

employees as a result of their access to the company's confidential and proprietary information. Because this information was protected by a confidentiality agreement the former employees had each signed, the utilization of the "scraper" program was "unauthorized."

The *Explorica* decision also clarified the types of losses that constitute recoverable damages under the CFAA. The *Explorica* court observed that CFAA covered more than the losses directly caused by the unauthorized accessing of a computer system, such as actual physical damage to a computer hard drive holding a company's proprietary information. In *Explorica*, costs associated with making a company's computer database more "hacker-proof" in response to the unauthorized access constituted a recoverable loss. The *Explorica* decision confirmed that any losses stemming from the unauthorized conduct are recoverable, as long as, in the aggregate, they meet the $5,000 threshold specified in the CFAA. In sum, the *Explorica* decision demonstrates the ease with which a plaintiff may be able to satisfy the "unauthorized" element and the $5,000 damages element.

The court has found two unpublished opinions that represent the seemingly growing trend toward utilizing the CFAA in employer-employee litigations. The first one involved claims made by a computer systems company against former employees who illegally misappropriated confidential information in setting up a competing business. In the second one, a computer systems manufacturer sued its sales representative for violation of the CFAA after the representative e-mailed confidential client information to himself and then went to work for plaintiff's competitor.

## B. Venue

■ Defendants have filed a complaint for declaratory judgment in the Western District of Washington (No. C03–329Z). Defendants argue that the present case should be dismissed for lack of subject matter jurisdiction or in the alternative, be transferred to and consolidated with their pending case in the Western District. PAE, defendants in the Western District case, have filed a motion to dismiss or transfer. Judge Zilly, the assigned judge to that case, issued a Minute Order on April 10, 2003 which defers any ruling on PAE's motion there until this court rules on PAE's pending preliminary injunction motion here.

Defendants contention that the Western District is the proper venue for this case, based on convenience, is not convincing. All defendants reside in or about Wenatchee, Washington. Therefore, under 28 U.S.C. § 1391, venue is proper where the defendants reside-here in the Eastern District.

## C. Preliminary Injunction

Having determined that jurisdiction is proper pursuant to 28 U.S.C. § 1331 because PAE has alleged violations of the CFAA and venue is proper based on all parties residing in Wenatchee, Washington, the court now addresses plaintiff's motion for preliminary injunction and defendants' opposition.

PAE moves for preliminary injunctive relief ordering that from the date of the order until the time of trial or other final adjudication, defendants: 1) be enjoined from soliciting, contacting, or conducting business with any entity that was a customer of PAE in the 12 months prior to August 22, 2002; 2) be enjoined from delivering any product, device, or technology to any entity that was a customer of PAE in the 12 months prior to August 22, 2002;

3) return all property belonging to PAE including originals and all copies of any PAE customer information or lists, business card files, and any copies of designs, sketches, notes, or schematics created while in the employ of, or on behalf of, PAE; and 4) be enjoined from selling, transferring, licensing, or assigning to any person or entity any inventions or technology pertaining to the design, manufacture, installation, and/or use of hermetic electrical connectors and/or packaging for electrical components. (Ct.Rec.30).

■ Either injunctive relief or damages, or both, may be awarded in a trade secret case. See *Tri–Tron Inter'l v. Velto*, 525 F.2d 432 (9th Cir.1975). A party seeking preliminary injunctive relief must fulfill one of two standards; the "traditional" or the "alternative." *Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir.1987). Under the traditional standard, this court may issue preliminary injunctive relief if it finds that "(1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief." *Id.* To obtain preliminary injunctive relief in the alternative, a movant must demonstrate "either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits raised and the balance of hardships tips sharply in its favor." *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1517 (9th Cir.1992) (citations omitted).

The alternative standards represent "extremes of a single continuum," rather than two separate tests. *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978). "The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1389 (9th Cir.1988). A "serious question" is one on which the movant has a "fair chance of success on the merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir.1984). Generally, the "balance of harm" evaluation should proceed the "likelihood of success analysis" because until the balance of harm has been evaluated the court cannot know how strong and substantial the plaintiff's showing of the likelihood of success must be. *Alaska*, 856 F.2d at 1389. So the court begins its analysis with the balance of harm.

### 1. Balance of Harm Analysis

PAE asserts that it will suffer irreparable harm if preliminary injunctive relief is not granted and defendants are permitted to continue allegedly benefitting from PAE's confidential customer information and its technology. (Ct. Rec. 34 at page 23).

■ "[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92–93 (3rd Cir.1992); *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2nd Cir.1999) (loss of trade secrets cannot be measured in money damages). Unlike a copyright infringement plaintiff, however, a trade secrets plaintiff who shows likely success on the merits of its claim is not entitled to a presumption of irreparable harm. *Campbell Soup*, 977 F.2d at 92.

■ The gravamen of plaintiff's argument is that it will suffer irreparable injury if defendants are allowed to continue use of the customer lists and information,

because PAE will be deprived of the value of a trade secret in which it has invested significant time and money. PAE argues that harm resulting from lost profits and lost customer goodwill and business is irreparable because it is neither easily calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief. (Ct. Rec. 34 at pp. 23–24). PAE also argues that under Washington law, a finding of irreparable harm is not required under Washington's UTSA. *Id.* at 24.

Defendants argue that PAE's customer lists and information is not a trade secret (Ct. Rec. 41 at pp. 20–24). Further, defendants assert that the effect of a preliminary injunction will be devastating to both RAAD and the families it employs. *Id.* at 23. Defendants further cite in their response brief papers that RAAD has invested money in its new machinery to the tune of $250,000 and RAAD faces imminent bankruptcy if it cannot pay down its line of credit. *Id.* Finally, defendants request that the court permit a "full" evidentiary hearing (of six days) on PAE's motion for preliminary injunction pursuant to Fed. R.Civ.Pro. Rule 43. (Ct. Rec. 41 at page 24).

PAE replies that regardless of whether a preliminary injunction will devastate RAAD and place it in the throws of bankruptcy, any harm to RAAD resulting from being preliminarily enjoined from continuing trade secret misappropriation is legally irrelevant. (Ct. Rec. 55 at page 10). Plaintiff's reasoning appears to be that a defendant who builds a business based upon a clear violation of the trade secrets and employment agreements of the plaintiff cannot defeat a preliminary injunction by claiming the business will be harmed if the defendant is forced to respect those trade secrets and employment-related agreements. PAE also replies it is opposed to any further delay of its preliminary injunction motion, which a six-day evidentiary hearing would cause. (Ct. Rec. 55 at page 10).

The court finds that the balance of harm tips decidedly toward the plaintiff. PAE has submitted evidence that Taylor contacted at least one PAE customer Northrup Grumman in an effort to obtain work for RAAD, allegedly in violation of his employment agreement prohibiting such solicitation.[17] PAE has also provided undisputed evidence that customer list and proprietary information has been provided to RAAD's sales representative Mark Kline in an effort to solicit business in competition with PAE.

As for the comprehensive evidentiary hearing requested by defendants, the court declines to hold such a hearing. This is a preliminary injunction hearing, which the court, in its discretion, has decided to hear on the basis of the numerous declarations submitted instead of live testimony.

## 2. Likelihood of Success Analysis

We next consider whether, under Washington law, PAE has established a likelihood of success on the merits for claims of: (1) misappropriation of trade secrets; (2) breaches of confidentiality, nonsolicitation, and assignment of invention agreements; and (3) violations of assorted common law duties, including the duty of loyalty and confidentiality[18]. PAE did not move for a

---

17. Taylor Dep. at pp. 62–65. Defendants' efforts to allegedly solicit other PAE customers is described in Attachment 1 to Defendants' Motion for Preliminary Injunction, §§ 97–119, filed under seal pursuant to § F of the Court's Protective Order.

18. The court is aware of plaintiff's additional claims of tortious interference, civil conspiracy and unfair competition. The court will not specifically address the merits of these claims in this order.

preliminary injunction on the basis of its CFAA claim.

### a. PAE's Customer Information and Technology Conceived But Not Disclosed During Taylor's and Petri's Employment At PAE As Trade Secrets and Misappropriation Thereof

■ In order to establish a claim for misappropriation of a trade secret under the Washington Uniform Trade Secrets Act ("UTSA"), the plaintiff must first prove that a legally protectable trade secret exists. *Boeing Co. v. Sierracin Corp.*, 108 Wash.2d 38, 738 P.2d 665 (1987). The UTSA prohibits "actual or threatened" misappropriation of trade secrets. RCW 19.108.010(4) defines a trade secret as information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

■ Therefore, to succeed on a claim for the misappropriation of a customer list trade secret under Washington law (R.C.W. 19.108.010, et seq.), a party must establish (1) that the information derives independent economic value from not being generally known or readily ascertainable to others who can obtain economic value from knowledge of its use and (2) that reasonable efforts have been taken to maintain the secrecy of the information.

Misappropriation includes the "acquisition ... by a person who knows or has reason to know that the trade secret was acquired by improper means." RCW 19.108.010(2). Improper means "includes theft, ... breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic means." RCW 19.108.010(1). The UTSA expressly authorizes injunctive relief. RCW 19.108.020. The Washington Supreme Court has held that customer contact information, whether retained only in an employee's memory or in a compilation of notes or business cards, can constitute a trade secret and injunctions are appropriate to prevent unfair competition by former employees who have violated the UTSA. *Nowogroski Ins., Inc. v. Rucker*, 137 Wash.2d 427, 437, 440, 971 P.2d 936 (1999).

The Supreme Court in *Nowogroski* set out a three-part test: "(1) whether the [customer] list is a compilation of information; (2) whether it is valuable because unknown to others; and (3) whether the owner has made reasonable attempts to keep the information secret."

■ We first consider whether PAE's customer or client list, which contains the identities, preferences and project information of its client contacts, constitutes a protectable trade secret. Defendants argue that anyone could acquire the information PAE contends is trade secret information through independent means, i.e. Internet sources, trade publications, telephone directories, and public libraries. (Orazem Decl.).

The court recognizes that it is possible to perhaps acquire some customer information through the World Wide Web and other public sources and means. However, after being made aware of the identities of the specific contact persons through their positions at PAE, the defendants cannot now feign ignorance of this information. The court finds that PAE will have probable success showing that customer project information, purchasing history, detailed information about customer's needs, technical project details, and the

identities of individual contact people with whom Taylor and Petri dealt with at PAE qualify as protectable trade secrets[19].

PAE also presents evidence that Taylor allegedly "boasted" to at least four witnesses that he was taking inventions with him that he had apparently conceived while still employed at PAE. (Ct. Rec. 34 at page 11). Defendants flatly disputed this testimony. While this presents an open question as to whether Taylor had conceived and possibly reduced to practice any technology on PAE's time and resources, it will not prevent the issuance of a preliminary injunction where other potential trade secrets are identified (customer list and detailed customer information) and a strong showing of possible misappropriation.

Second, the court considers whether PAE will likely prevail on showing that PAE took appropriate and reasonable measures to prevent unauthorized disclosure of the information and technology it claims to be protected trade secrets. Considering the several confidentiality and employment agreements signed or agreed to by Taylor, Petri and other PAE employees, various security precautions, proprietary rights notice embedded on every technical drawing, and passwords limiting access, the court concludes that PAE will also likely prevail in meeting this element of its trade secret misappropriation claim.

Third, the court considers whether PAE will likely prevail in showing that the infor-

mation was valuable because it was unknown to others. The e-mail from RAAD's sales representative Mark Kline lends solid support of PAE's arguments that customer contact information ("leads that get me to the key people") is of significant value in the parties' industry and was not readily available to Kline who stated that it was the "hardest part of [his] job." (Ct. Rec. 55 at pp. 7–8). The evidence indicates that Kline settled for a 38% reduction of his potential compensation because of the advantage he gained from the customer list provided to him by Taylor and Petri. (Ct. Rec. 78 at page 6).

Defendants present the declarations of Jan Orazem, RAAD's new sales representative and Jack Pollack, a competitor of PAE, in an effort to show that the customer information PAE describes as "trade secrets" can be located through the Internet, networking, libraries, trade journals, newsletters and other publically available avenues. (Ct. Rec. 41 at page 22). Defendants' contentions raised by these declarations are considered by the court but not compelling. Although it may be possible that the customer contact list assembled over Taylor's and Petri's years at PAE could be duplicated, such duplication it seems would only occur with great difficulty. Nevertheless, whether RAAD could generate the list and information on its own, it appears it did not[20]. Rather, the only basis for RAAD's knowledge of the customer information appears to be from

19. The court relies in part on the testimony of PAE's Chief Executive Officer Don Wright who described the needle-in-the-haystack character of the search for the handful of engineers in large companies who might have a use for one of PAE's customized products. (Wright Decl. ¶¶ 18–20). Wright also testified that Taylor and Petri maintained on PAE's computer system a compilation of their customer contacts on databases that were protected by passwords to prevent unauthorized access. At the time Taylor left PAE, his database contained approximately **700** customer contacts. (Wright Decl. ¶ 16).

20. PAE presents evidence that Petri took five CD's containing backups of all of PAE's technical drawings and Taylor allegedly copied design information from a PAE computer onto over 30 diskettes on July 16, 2002, weeks before he left PAE and two months after he attempted to raise investments for his new venture. (Ct. Rec. 55 at page 9).

Taylor's and Petri's direct exposure to the information resulting from their employment relationship with PAE. The court finds that PAE will probably prevail on the merits of its trade secret misappropriation claims.

### b. Use of the "Trade Secrets" In Breach of Agreements and Common Law Duties

We next consider whether defendants' use of trade secrets—specifically the customer information and allegedly conceived but undisclosed technology—was a breach of executed employment related contracts and/or a breach of common law duties. Washington law imposes a duty not to use trade secrets in competition with a former employer.[21] The Employment Agreement and the Invention and Confidential Information Agreement, signed by PAE employees, including Taylor and Petri, clearly reinforces this duty, requiring that Petri and Taylor keep all trade secrets and client lists and information strictly confidential during and after their employment with PAE.

The defendants make much of a distinction between whether Taylor was fired or resigned. Defendants assert that Taylor was fired or "terminated without cause," which purportedly means that under his Employment Agreement he is only restrained from soliciting Company employees or contacting customers for six (6) months after the expiration of the contract, as opposed to two years. Therefore, defendants conclude, Taylor is free to pursue his profession as of November 30, 2002. (Ct. Rec. 41 at page 19).

Defendants also craft an argument that Taylor's 1994 Invention and Confidential Information Agreement, in which he agreed to maintain the confidentiality of PAE's information and to assign to PAE any rights to inventions made or conceived during his employment at PAE, was superceded by his 1997 Employment Agreement, and 2000 renewal. Defendants use this argument to again, support their theory that the maximum length of time Taylor could be restrained from contacting PAE customers would be six months from the date of the expired terms of his 2000 contract, or six months from May 31, 2002 (November 30, 2002).

The court, however, finds that although defendants raise an open question about Taylor's employment status on August 22, 2002, this does not affect the issuance of a preliminary injunction when a probable trade secret is identified along with probable misappropriation prior to November 30, 2002. Further, Mrs. Taylor testified at her deposition[22] that every employee at PAE was required to sign an Invention and Confidential Information Agreement, prohibiting him or her from disclosing confidential information, such as customer lists, to anyone. This agreement contains no limitation on its duration of secrecy and, was an agreement signed by both Taylor and Petri. In this way, it makes explicit an employee's implied duties under Washington law with respect to confidential and trade secret information.

The agreements executed by Taylor and Petri reinforce their duties under Washington law not to use a former employer's trade secrets against it. Accordingly, this court concludes that plaintiff has at least a "fair," if not a "probable," chance of succeeding on more than one of the causes of action alleged in its complaint.

**21.** See *J.L. Cooper & Co. v. Anchor Securities, et al.,* 9 Wash.2d 45, 113 P.2d 845 (1941); *Kieburtz & Assocs., Inc. v. Rehn,* 68 Wash. App. 260, 842 P.2d 985 (1992); *Organon Inc. v. Hepler,* 23 Wash.App. 432, 595 P.2d 1314 (1979) (cases cited by plaintiff) (Ct. Rec. 34 at pp. 22–23).

**22.** Kristen Taylor's Dep. at page 55.

### 3. Scope of Injunction

■ An issue that courts face in framing orders to prevent defendants from competing unfairly by using another's trade secrets while still permitting defendants to compete fairly using public information and their own talents and experience, arises in this case. Although not raised by either party, another issue at stake in this case appears to be the public interest. When considering a preliminary injunction motion, the court must balance the parties' harm and the injury that the injunction's issuance would inflict on other interested parties and the public interest. See *Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224 (N.D.Iowa 1995).

Where the public interest is involved, the court must examine whether that interest favors the movant for an injunction. *Sammartano v. First Judicial District Court*, 303 F.3d 959, 965 (9th Cir.2002). While this inquiry is sometimes subsumed into the balancing of hardships, it is better seen as an element that deserves separate attention in cases where the public interest may be affected. *Id.* at 974. The public interest inquiry primarily addresses impact on non-parties rather than parties. *Id.*

■ National security, economic, and environmental concerns are valid public interest concerns in the context of preliminary injunctive relief. See *National Wildlife Federation, et al. v. National Marine Fisheries Service, et al.*, 235 F.Supp.2d 1143 (W.D.Wash.2002). PAE's (and allegedly RAAD's) connectors and housings are used on projects of important public interest: the Space Shuttle, the Hubble Telescope, the International Space Shuttle, the Longbow Hellfire Modular Missile System used in conjunction with the Apache Helicopter, and medical devices implanted in the human body. (Ct. Rec. 34 at page 3). PAE presents evidence that defendants have obtained business with at least a small number[23] of PAE customers such as BAE Systems, Lockheed Martin, Santa Barbara Focal Plan, Raytheon, Northrop Grumman[24], L3 Communications, and Superconducting Industries. Surely it is within the realm of possibilities that an important military concern of the day, such as the Apache Helicopter[25], or other equally important public interest, could be compromised if defendants are enjoined from contacting or conducting business with an entity that was a customer of PAE but is now doing business with RAAD, albeit possibly through improper solicitation by defendants[26].

---

**23.** Less than a dozen companies out of a total of approximately 157 companies with which PAE does business. (Ct. Rec. 55 at page 3).

**24.** Northrop Grumman is a defense contractor that manufactures military aircraft, advanced weapon systems, and missiles. (Wright Decl., ¶ 18).

**25.** "The once-troubled Apache, however, experienced a phoenix-like renewal in the jagged mountains of Afghanistan. Army commanders say the helicopter transformed firefights against Taliban and al-Qaida warriors, surviving relentless ground fire to deliver Hellfire missiles, Hydra rockets and 30–mm. cannon rounds in support of American ground forces." Douglas Holt and Stephen J.

Hedges, *Once-troubled Apache helicopters head toward Gulf*, CHI. TRIB., Feb. 5, 2003.

**26.** (§§ 97–119). Petri testified that approximately 90% of the projects RAAD has bid on since he and Taylor left PAE are for companies that were customers at the time they left PAE. (Petri Dep. at page 53). Petri also testifies that RAAD has received an order for a qualification lot from Northrop Grumman which could be incorporated into something Northrop Grumman is making:

Q. "And then this connector is laser welded to the titanium housing; is that correct?
A. Yes.
Q. Have you received an order for this?
A. Yes.

While granting this preliminary injunction, the court will fashion the scope of this injunction to account for not only the private interests but also the public interests seemingly at stake here.

PAE's request that defendants be enjoined from delivering **any** product, device, or technology to any entity that was a customer of PAE in the 12 months prior to August 22, 2002 is, of course, too broad and vague. For instance, if RAAD were to develop a completely different technology and sell it to PAE customers by using Taylor's and Petri's own talents and experience and not misappropriated trade secrets, this would be fair competition.

The court concludes that an injunction against the defendants to prevent them from engaging in trade secret misappropriation, breach of employment agreements and common law duties, and unfair competition **in the future** is warranted at this time.

▇▇ With respect to the current active [27] customers alleged to have been improperly obtained by defendants, the court, based on public interest concerns and the relative ease of proving monetary damages from defendants' disgorged profits, concludes that any injury PAE may have suffered or will suffer as a conse-

Q. What's been ordered?
A. Quantity of two.
Q. It's your understanding that that's a qualification lot; is that correct?
A. Yes.
Q. And do you know one way or the other whether those parts will be incorporated into anything Northrup Grumman is actually making?
A. No, I don't know one way or another.
(Petri Dep. at page 168).

27. By "active" customer this court means a customer having a purchase order or project underway or completed with defendants.

28. See *Winston Research Corp. v. Minnesota Mining & Manufacturing Co.,* 350 F.2d 134

quence can be remedied by awarding damages [28]. Therefore, the court finds that only threats of disclosure or destruction of PAE's trade secrets (future misconduct) in this case constitutes irreparable injury justifying injunctive relief by the court.

### 4. Injunction Bond

Pursuant to Fed.R.Civ.P. Rule 65(c), the court will require that PAE post a bond as security for issuance of a preliminary injunction. The bond (cash or surety) is set at $250,000 (two hundred fifty thousand dollars).

## V. CONCLUSION

For the foregoing reasons, PAE's motion for preliminary injunction (Ct.Rec.30) is **GRANTED** [29].

Upon the posting of the bond by plaintiff, defendants Edward Taylor, Kristen Taylor, James Petri, RAAD Technologies, Inc., its officers, agents, servants, employees, assigns, successors, and all other persons in active concert, combination, or participation with them, are **HEREBY RESTRAINED AND ENJOINED** from:

1) soliciting, contacting, or conducting business with any entity that was a customer of PAE in the 12 months prior to August 22, 2002, **and which is not currently an active customer of defendants** [30];

(9th Cir.1965) for the suggestion that an award of money damages would be appropriate if former employee defendant had sold machines built in violation of former employer plaintiff's trade secret rights, allowing profits to be calculated.

29. Also **GRANTED** are the parties' motions to file overlength briefs (Ct. Rec. 28 and 58). Preliminary injunction motions often justify treatment as dispositive motions in determining the applicable rule for length of briefs.

30. The court has used bold typeface to designate the changes made to plaintiff's original injunctive relief requested.

2) delivering any product, device, or technology **relating to hermetic electrical connectors and/or packaging for electrical components** to any entity that was a customer of PAE in the 12 months prior to August 22, 2002 and **not currently an active customer of defendants;**

3) return all property belonging to PAE including originals and all copies of any PAE customer information or lists, business card files, and any copies of designs, sketches, notes, or schematics created while in the employ of, or on behalf of, PAE; and

4) selling, transferring, licensing, or assigning to any person or entity any inventions or technology pertaining to the design, manufacture, installation, and/or use of hermetic electrical connectors and/or packaging for electrical components.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and forward copies of this order to counsel.