## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HIPCRICKET, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11135-CB |
| | ) | |
| mGAGE, LLC and GLENN STANSBURY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 4, 2016
Date Decided: July 15, 2016

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Kenneth J. Rubinstein, Joseph M. Vann and Jackson S. Davis, COHEN TAUBER SPIEVACK & WAGNER P.C., New York, New York; *Counsel for Plaintiff Hipcricket, Inc.*

Stephen B. Brauerman, Vanessa R. Tiradentes and Sara E. Bussiere, BAYARD, P.A., Wilmington, Delaware; Peter F. Schoenthaler and Bryan L. Baysinger, THE SCHOENTHALER LAW GROUP, Atlanta, Georgia; *Counsel for Defendants mGage, LLC and Glenn Stansbury.*

**BOUCHARD, C.**

This post-trial decision resolves various claims that Hipcricket, Inc., a mobile marketing company, asserted against a former employee, Glenn Stansbury, and one of its competitors, mGage LLC, which hired Stansbury shortly after Hipcricket filed for bankruptcy protection in early 2015.

During his tenure at Hipcricket, Stansbury served as an executive in sales, and received commissions and bonuses under an agreement that prohibited him from soliciting Hipcricket's customers and employees and from using its confidential information after his employment ended. Almost immediately after joining mGage, Stansbury began contacting clients of Hipcricket, including some of his former accounts, to solicit business for mGage. This prompted Hipcricket to sue Stansbury and mGage in June 2015 for breach of Stansbury's commission agreement and other claims.

Because of Hipcricket's bankruptcy, Stansbury was not paid certain commissions and other amounts material to him that he earned pre-petition. Stansbury filed a proof of claim for these amounts in the bankruptcy proceeding. Critical to this action, in May 2015, fully aware of Stansbury's claim, and when Hipcricket knew Stansbury was working for mGage and believed he was violating the non-solicitation and confidentiality provisions in his commission agreement, Hipcricket decided not to assume (and thereby rejected) Stansbury's commission

agreement. As a result, instead of being put on a track to be paid in full, Stansbury's claim was relegated to general unsecured status.

Under the Bankruptcy Code, the rejection of an executory contract means that the contract is deemed to have been breached as of the petition date, and courts then look to state law to determine the legal effect of that breach. Applying the governing law of the state of Washington, I conclude that Hipcricket's material breach of the commission agreement rendered the non-solicitiation and confidentiality provisions in it unenforceable. For this reason, judgment is entered in defendants' favor for the claims Hipcricket has asserted that are based on the commission agreement.

Hipcricket also sued defendants for violating the Washington Uniform Trade Secrets Act. I conclude for the reasons explained below that Hipcricket has proven this claim and is entitled to a permanent injunction to prevent defendants from further misappropriating its trade secrets.

## I.     BACKGROUND

The following are the facts as I find them based on the documentary evidence and witness testimony.[1] I accord the evidence the weight and credibility I find it deserves.

---

[1] Joint trial exhibits are cited as "JX ___". The trial transcript is cited as "Tr. ___". Stipulated facts in the Pretrial Order are cited as "PTO."

## A. The Parties

Plaintiff Hipcricket, Inc. is a Delaware corporation with its principal place of business in Bellevue, Washington.[2] Hipcricket is a mobile marketing company that provides end-to-end, data-driven mobile advertising and marketing solutions (largely through text and multimedia messages) through its proprietary AD LIFE® platform.[3]

Defendant mGage, LLC is a Delaware limited liability company.[4] mGage is a direct competitor of Hipcricket.[5] A substantially larger company than Hipcricket, mGage is a "Tier 1 aggregator," which means that it has direct connections to all five major cellular carries in the U.S.[6]

Defendant Glenn Stansbury was employed at Hipcricket from October 2008 until March 13, 2015, eventually becoming its Vice President of Sales.[7] Stansbury

---

[2] PTO ¶ 1.

[3] Tr. 378, 401 (Stovall); PTO ¶ 2.

[4] PTO ¶ 3.

[5] *Id.* ¶ 3; Tr. 11-13 (Stansbury); Tr. 337-38 (Scholl).

[6] Tr. 12-13, 118 (Stansbury); Tr. 335-38 (Scholl).

[7] Tr. 7-16, 9-24 (Stansbury); Tr. 380 (Stovall); PTO ¶¶ 4-6.

began working with mGage on March 16, 2015.[8] He is currently mGage's head of sales and oversees mGage's sales force and account managers across the country.[9]

## B. Hipcricket Explores Strategic Alternatives

In 2014, Hipcricket retained Canaccord Genuity to explore and evaluate potential strategic alternatives.[10] An online data room was created.[11] To gain access to the data room, interested parties were required to sign a non-disclosure and confidentiality agreement.[12]

In April 2014, in connection with evaluating a potential acquisition of Hipcricket, mGage executed a non-disclosure and confidentiality agreement.[13] Between September and December 2014, numerous individuals employed by or affiliated with mGage accessed the data room, which contained information about Hipcricket's customer, vendor, and employee relationships.[14] mGage also received detailed information regarding Hipcricket's customer relationships through e-

---

[8] PTO ¶ 6.

[9] Tr. 59 (Stansbury); PTO ¶ 6.

[10] PTO ¶ 11.

[11] *Id.*

[12] *Id.*

[13] *Id.*; JX 3.

[14] JX 4; PTO ¶¶ 11-12.

mails,[15] and met with certain Hipcricket employees, including Stansbury.[16] In late 2014, mGage decided not to pursue a transaction with Hipcricket.[17]

### C. Stansbury's Commission Agreement with Hipcricket

As condition of his employment with Hipcricket, Stansbury entered into annual agreements with the company. Relevant here, the last agreement he signed before leaving the company was effective for the period from March 1, 2014 to February 28, 2015 (the "Commission Agreement").[18]

The Commission Agreement set forth the rates of, and other the terms and conditions governing, commission and bonus award payments Stansbury could receive for generating sales for the company. It provided that commission payments would be "paid on the month-end pay date following the month in which the client is billed,"[19] and that certain other bonus payments and awards would be paid after the close of the previous quarter or at the end of Hipcricket's fiscal year, which was at the end of February.[20]

---

[15] *E.g.* JX 6; *see also* Tr. 360-63 (Scholl).

[16] Tr. 18-19, 142 (Stansbury).

[17] PTO ¶ 13; Tr. 350-51 (Scholl).

[18] JX 1 § 3(b).

[19] *Id.* § 5(b).

[20] *Id.* §§ 5(f), 7.

The Commission Agreement contained several provisions prohibiting Stansbury from taking certain actions after his employment with the company ended. Section 10 prohibited Stansbury from soliciting Hipcricket customers for a period of two years after his employment ended:

> For a period of two (2) years after the date of termination of Sales Professional's employment with Employer, Sales Professional shall not, directly, or indirectly, solicit Employer's Clients for the purpose of selling such client services then offered or available through Employer.[21]

Section 9 of the Commission Agreement prohibited Stansbury from soliciting certain employees for a period of one year after his employment ended:

> During the term of Sales Professional's engagement or employment and for one year thereafter, The Sales Professional will not cause or attempt to cause any Sales Professional of the Company to cease working for the Company to retain an engagement or employment with another employer that is a competitor of the Company's. . . .[22]

Finally, Section 8(iii) of the Commission Agreement required Stansbury to maintain the confidence of Hipcricket's trade secrets during and after his employment with the company:

---

[21] *Id.* § 10. The Commission Agreement defines "Employer's Customers" [sic] as "all persons, firms, corporations, partnerships, limited liability companies and other legal entities and all governmental bodies or agencies (including municipalities) for which Employer is providing services as of the date of termination of Sales Professional's employment with Employer," and defines "Employer's Prospective Customers" [sic] as "all persons with whom the Sales Professional had material contact and/or whom they serviced in their role as a Sales Professional of the Company." *Id.*

[22] *Id.* § 9.

The Sales Professional agrees that during their engagement or employment with the Company and after their termination, the Sales Professional will keep in confidence and trust and will not use or disclose any Trade Secret or anything relating to any Trade Secret, or deliver any Trade Secret to any person or entity outside the Company without the prior written consent of an officer of the Company.[23]

The foregoing provisions in Sections 8-10 of the Commission Agreement are referred to hereafter as the "Post-Employment Restrictions."

### D. Hipcricket Files for Bankruptcy

On January 20, 2015 (the "Petition Date"), Hipcricket commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.[24] After filing for bankruptcy, Hipcricket continued to operate its business as a debtor-in-possession under the jurisdiction of the bankruptcy court.[25]

---

[23] *Id.* § 8(iii). The Commission Agreement defines a "Trade Secret" as "any method, technique, drawing, process, financial data, financial plan, product plan or list of actual or potential customers or vendors and suppliers of the Company or any portion or part thereof, whether or not copyrightable or patentable, that is of value to the Company and is not generally known to competitors of the Company or to the public, and whose confidentiality is maintained . . . in each case to the extent that the Company, as the context requires, derives economic value, actual or potential, from such information not being generally known to, and not being readily ascertainable by proper means by, other persons or entities who can obtain economic value from its disclosure or use." *Id.*

[24] PTO ¶ 14.

[25] *See, e.g.*, JX 337.

7

The bankruptcy court approved an auction and sales process. Hipcricket ultimately selected a bid from, and eventually became a wholly owned subsidiary of, ESW Capital, LLC when it emerged from bankruptcy on May 15, 2015.[26]

### E.    Stansbury Leaves Hipcricket for mGage

On January 22, 2015, Stansbury learned about Hiprcricket's bankruptcy filing.[27] That same day, he pulled reports from Salesforce, a program which Hipcricket used to track accounts, opportunities and activities,[28] and sent the reports to himself through Hightail, a cloud-based program for sending and storing large files.[29] Stansbury testified that he never looked at, opened, or downloaded any of the Salesforce reports he sent to his Hightail account,[30] and that the Salesforce reports he sent there were set to expire automatically a week after he sent them, meaning that he no longer could access them after that time.[31]

Soon after learning about Hipcricket's bankruptcy filing, Stansbury contacted Jay Sheth, mGage's Chief Executive Officer at the time, whom

---

[26] PTO ¶¶ 10, 14; Tr. 379 (Stovall).

[27] Tr. 19-20 (Stansbury).

[28] Tr. 149-150 (Stansbury); JX 1 § 4(b).

[29] Tr. 20-25 (Stansbury); JX 7.

[30] Tr. 22-24 (Stansbury).

[31] *Id.*; JX 7. According to Stansbury, the files expired because he was using a trial version of the Hightail software. Tr. 24.

8

Stansbury had met during mGage's due diligence of Hipcricket.[32]  On March 5, 2015, Stansbury accepted a job offer from mGage with a March 16 start date.[33]  On March 10, Stansbury signed an "Employment Covenants Agreement" with mGage containing non-solicitation and confidentiality provisions similar to the Post-Employment Restrictions in the Commission Agreement.[34]

On March 6, 2015, Stansbury sent an e-mail to Doug Stovall, who was then President of Hipcricket, stating that he was resigning from Hipcricket.[35]  Stansbury stayed another week and officially stopped working for Hipcricket on March 13.[36]  Before leaving, Stansbury asked Stovall how Hipcricket wanted him to notify his clients that he was leaving the company.[37]  Stovall never responded to this request.[38]

---

[32] Tr. 141-143 (Stansbury).

[33] JX 16.

[34] *Id.* at mGage - 010314-22.

[35] JX 17.

[36] *See* JX 17; JX 18.

[37] Tr. 34-35 (Stansbury); JX 18.

[38] Tr. 35 (Stansbury); Tr. 479 (Stovall).

**F. Hipcricket Explains to Stansbury How Amounts He Had Earned Would Be Treated in the Bankruptcy Proceeding**

After Hipcricket filed for bankruptcy, payments to Hipcricket employees became governed by the Bankruptcy Code. On March 18, 2015, Tiffany Bradford, Hipcricket's Director of Finance, sent Stansbury a letter and an e-mail advising him how his compensation and other items would be treated in the bankruptcy proceeding.[39] Bradford explained that, for all employees, Hipcricket was only permitted to give priority treatment to pay wages earned pre-petition up to a cap of $12,475, and that any pre-petition wages above this cap would become an unsecured claim for which Stansbury could file a proof of claim.[40]

The materials Bradford sent Stansbury on March 18 included a schedule containing a detailed explanation of the pre-petition and post-petition amounts concerning Stansbury. The schedule showed that, after Hipcricket paid Stansbury $12,475 under the wage cap, Stansbury would have a general unsecured claim in the amount of $30,831, consisting of $9,427 of personal time off (PTO) that was "accrued pre-petition" and $21,404 in commissions that were "earned pre-petition."[41]

---

[39] JX 24; JX 25.

[40] JX 24; JX 25; *see also* Tr. 459-460, 463-64 (Bradford).

[41] JX 25 at HC000154. For simplicity, I have dropped the cents from the figures in Stansbury's proof of claim throughout this opinion.

Under the bankruptcy process, Hipcricket was permitted to pay Stansbury salary and commissions he earned post-petition. Stansbury confirmed he received these amounts.[42]

### G. Hipcricket Rejects the Commission Agreement to Clear the Way For Confirmation of its Reorganization Plan

On March 20, 2015, Hipcricket proposed a plan of reorganization, which it amended on March 31 (the "Reorganization Plan").[43] On April 3, 2015, Hipcricket filed a schedule of assumed contracts and unexpired leases.[44] Hipcricket included the Commission Agreement on the schedule as a contract it intended to assume, and designated the cure cost for the Commission Agreement as "$0.00."[45]

On April 15, 2015, after learning that Stansbury allegedly had solicited one of its customers, Hipcricket sent Stansbury a letter demanding that he "cease and desist" from further customer solicitations.[46] On April 28, 2015, Stansbury's counsel responded to the cease-and-desist letter, asserting that the Commission Agreement was unenforceable due to Hipcricket's rejection of the agreement.[47]

---

[42] Tr. 269, 273-274 (Stansbury); JX 145.

[43] JX 335; JX 337.

[44] JX 339; JX 340.

[45] JX 340 at 75; Tr. 483-484 (Stovall).

[46] JX 58.

[47] JX 83. Counsel apparently was anticipating that the Commission Agreement would be rejected, because that did not actually occur until May.

11

On April 30, 2015, Stansbury filed a proof of claim with the bankruptcy court using the calculations he received from Bradford on March 18, which were attached to the proof of claim.[48] Consistent with those calculations, Stansbury's proof of claim listed as "due and outstanding" a $30,831 "unsecured non-priority" claim.[49]

On May 11, 2015, Stansbury objected in the bankruptcy court to Hipcricket's "attempt to assume or accept specific clauses in the Commission Agreement [*i.e.*, the Post-Employment Restrictions], without honoring the Agreement in full" by paying him the amounts listed in his proof of claim.[50] That same day, Hipcricket submitted a brief in support of confirmation of the Reorganization Plan in which it acknowledged that Stansbury and four other employees had objected to the assumption of their Post-Employment Restrictions,[51] and stated that "[t]he Debtor has removed the agreements in question from the Schedule," thereby mooting their objections.[52]

---

[48] JX 86; Tr. 52-54 (Stansbury)

[49] JX 86.

[50] JX 342, ¶ 6; Tr. 57 (Stansbury).

[51] JX 421 p. 2, ¶ 3. The brief referred to assuming the employees' "Confidentiality and Non-Solicitation Agreements," which I understand to mean, in Stansbury's case, the Post-Employment Provisions in his Commission Agreement.

[52] *Id.*

Hipcricket's decision not to assume the Commission Agreement and the agreements of the other four objecting employees cleared the path for the bankruptcy court to approve the Reorganization Plan.[53]  On May 15, 2015, the bankruptcy court entered an order confirming the Reorganization Plan, which provided for the rejection of "all other executory contracts and unexpired leases" other than those assumed.[54]

## H.    Stansbury's Communications with Hipcricket Clients

When Stansbury left Hipcricket to join mGage, he asked Kimya Coker, an mGage marketer, to draft a form e-mail to go to his contacts regarding his employment with mGage.[55]  The e-mail, entitled "Good news…," stated as follows:

> Hi ____ - I hope you're doing great.  I want to let you know that I'm no longer working at Hipcricket.  I haven't updated my LinkedIn yet and that's the last way you should find out.
>
> The good news: I've joined mGage, a 15-year leader in the mobile marketing space and a trusted provider for over 1,000 brands across the globe. They're also the foremost expert in short code migration for companies looking to transition their short codes and messaging with no downtime, service interruption, or hassle.
>
> I would love the opportunity to work together again soon, and I'm hoping we can catch up when you have minute so I can explain why I

---

[53] JX 343 ¶ NN; Tr. 57-58 (Stansbury); Tr. 485-86 (Stovall).

[54] JX 343 ¶ MM; Tr. 486 (Stovall).

[55] Tr. 60-62 (Stansbury).

joined mGage. **Let me know when you're free -- does next week work?**[56]

Coker sent the "Good news" e-mail to all of Stansbury's contacts for him.[57]

At trial, Hipcricket adduced evidence of contacts between Stansbury and a number of its customers, which is summarized below. This evidence demonstrates that Stansbury solicited a number of Hipcricket customers almost immediately after joining mGage and during the ensuing months.[58]

### 1. iHeart

On March 23, 2015, one week after joining mGage, Stansbury, asked Michelle Savoy, a former iHeart employee, for contact information for the person in charge of iHeart's mobile messaging business.[59] iHeart, which is sometimes referred to as Clear Channel Broadcasting,[60] is an owner and operator of radio

---

[56] JX 34 (emphasis in original); *see also* JX 39; JX 41.

[57] Tr. 61-62 (Stansbury).

[58] In a footnote to its post-trial brief, Hipcricket asserts without any meaningful elaboration that Stansbury also solicited several other Hipcricket customers: MillerCoors, PKSW, and Reach Media. Pl.'s Post-Trial Op. Br. 26 n.31.

[59] Tr. 123, 168-69 (Stansbury); JX 30.

[60] Tr. 398-99 (Stovall).

stations and was Hipcricket's largest customer.[61] Savoy suggested contacting Michael Biondo, a member of the "core digital team."[62]

On April 14, 2015, Stansbury sent Biondo an e-mail to which he attached a Powerpoint presentation detailing mGage's mobile marketing capabilities. The e-mail described Stansbury's familiarity with Biondo from his time at Hipcricket and asked Biondo to considering switching iHeart's business from Hipcricket to mGage:

> I wanted to take this opportunity to introduce myself and my company mGage. I believe I had met you when I worked at Hipcricket. Obviously by email you can see I recently left Hipcricket and have joined mGage and I would welcome the opportunity to meet with you in NYC next week and talk about how we can help with all your mobile marketing needs. I know that iHeart is a very large and extensive client and I have worked with Kristi Miller when we were both at Hip and have a good understanding of iHeart and your mobile needs. I assure you that if any mobile company out there could manage your services and make the switch from your current provider to a new mobile firm it would be us. Not only can I assure a smooth transition but I am very confident we can provide you with great service and a much more cost effective way to manage all of this versus what you are currently paying.[63]

Stansbury acknowledged at trial that his e-mail was "an attempt to obtain iHeart's mobile messaging business."[64] After sending the e-mail, Stansbury shared

---

[61] JX 55; Tr. 162-63 (Stansbury).

[62] JX 30.

[63] JX 55.

[64] Tr. 172-73 (Stansbury).

15

information with mGage about iHeart's relationship with Hipcricket, including revenue estimates and details of the scope of services under the contract.[65]

On April 23, 2015, mGage and iHeart executed a non-disclosure agreement.[66] Stansbury asked Biondo for "as much detail as possible" about the services and features Hipcricket currently provided to iHeart, including the number of short codes, whether such short codes were provisioned for MMS,[67] Hipcricket's features and campaigns, and any custom functionality.[68] In an effort to further entice iHeart, Stansbury mentioned the possibility of mGage hiring Kristi Miller, the former iHeart account manager at Hipcricket.[69]

mGage made several presentations and proposals to iHeart, which culminated in a draft master services agreement that was presented on May 18.[70] As part of its proposal, mGage offered iHeart significant pricing concessions,

---

[65] Tr. 173-74 (Stansbury); JX 70.

[66] JX 75; Tr. 126-27, 175-77 (Stansbury).

[67] MMS messages are multimedia, and can include pictures or video, as distinguished from SMS messages, which are text-only. Tr. 9 (Stansbury). A "short code" is "basically . . . a phone number for short message systems, for SMS and MMS." Tr. 174 (Stansbury).

[68] JX 75; Tr. 175-76 (Stansbury).

[69] JX 75; Tr. 176-77 (Stansbury); *see also* JX 97; Tr. 309-310 (Miller).

[70] JX 114.

including unlimited messaging, converting short codes to MMS at no charge, and waiving certain fees.[71]

Throughout the process of soliciting iHeart, Stansbury worked with his superiors at mGage, including James Citron, mGage's Chief Revenue Officer.[72] Stansbury provided Citron a list of iHeart's short codes that "were associated to the Hip[cricket] platform."[73] As of July 2, Stansbury believed that mGage was "the front runner" to obtain iHeart's mobile messaging business.[74]

After mGage's initial presentation to iHeart, Biondo called Stovall at Hipcricket to tell him about mGage's proposal.[75] Using the favorable terms of mGage's proposal as leverage, Biondo asked Stovall, "[w]hat are you guys going to do to keep our business?"[76] Biondo was seeking to obtain better terms from Hipcricket even though iHeart's contract with Hipcricket at the time was not due to expire until November 30, 2016.[77]

---

[71] JX 98; JX 106; JX 108; JX 109; Tr. 184-87 (Stansbury).

[72] Tr. 169-171 (Stansbury).

[73] JX 79.

[74] JX 317; Tr. 194 (Stansbury).

[75] Tr. 391-94 (Stovall).

[76] *Id.*

[77] JX 146 § 7; Tr. 399-400 (Stovall).

17

Biondo sent Stovall a version of mGage's proposal.[78]  After reviewing it, Stovall became concerned that mGage's proposed fees and the number of short codes in the proposal were strikingly similar to those that Hipcricket was providing iHeart.[79]  According to Stovall, he had no choice but to make numerous concessions on pricing and services to retain iHeart's business because it was Hipcricket's largest customer.[80]  These negotiations began in June 2015 but did not result in a signed agreement until after trial, on December 7, 2015.[81]

## 2.  FordDirect/Team Detroit

While he was at Hipcricket, Stansbury did work for FordDirect, which was his largest client, and Team Detroit.[82]  FordDirect is a company formed by Ford Motor Company to manage technology for its dealer groups.[83]  Team Detroit is an advertising agency that handles Ford commercials.[84]  Before he left Hipcricket, Stansbury advised FordDirect that he was leaving, which prompted FordDirect to

---

[78] JX 116; JX 117.

[79] Tr. 393-96 (Stovall); *see also* Tr. 189-90 (Stansbury).

[80] Tr. 395-96, 400, 524-25 (Stovall).

[81] Pl.'s Post-Trial Op. Br. 19.

[82] JX 18.

[83] Tr. 64-65 (Stansbury).

[84] *Id.*

ask where he was going,[85] and mGage asked Stansbury to plan to attend a meeting with Team Detroit that was in the process of being scheduled.[86]

mGage and its predecessor entities had past client relationships with FordDirect and Team Detroit.[87] After he joined mGage, Stansbury was tasked with managing the Ford relationships because he "used to run the Ford relationship at his former employer and knows these folks well."[88]

On March 23, 2015, FordDirect issued a request for proposal (RFP) for mobile services, seeking bids by April 6. On March 28, Citron asked Stansbury to "share any & all documents (i.e. flows, etc.) that you think will be helpful" to prepare a bid in response to the RFP.[89] To assist with mGage's preparation of a bid, Stansbury circulated internal Hipcricket documents to other mGage employees.[90] One document consisted of an "upsell" that Stansbury "was working on with Ford Direct" to solicit business for Hipcricket. It was stamped "©2013 Hipcricket – Confidential and Proprietary."[91] Another document came from

---

[85] Tr. 147 (Stansbury): JX 13 at mGage – 002389.

[86] JX 255; Tr. 72 (Stansbury).

[87] Tr. 67-68 (Stansbury); 357-59 (Scholl).

[88] JX 22; *see also* Tr. 75 (Stansbury), 357 (Scholl).

[89] JX 209.

[90] JX 32; JX 33.

[91] JX 33; *see also* Tr. 83, 234-35 (Stansbury); Tr. 432 (Stovall).

19

Hipcricket's internal "JIRA" system, which tracked information on the FordDirect account, including contacts and technical information about "message flow components."[92] Stansbury testified he did not know where he obtained these documents.[93] That testimony is not credible.

Stansbury also helped mGage recruit a former Hipcricket employee (Greg Hoy) to help mGage solicit FordDirect. Hoy engineered Hipcricket's pricing and products for FordDirect, including the "rate cards" Hipcricket used to price contracts with all of its clients.[94]

### 3. Cumulus Media

In early April, 2015, Stansbury began assisting Darren Metzger, director of enterprise sales at mGage, in his pursuit of business from Cumulus Media, an owner and operator of radio stations.[95] Although Stansbury did not have a relationship with Cumulus while he was at Hipcricket, he knew it was a Hipcricket customer.[96]

---

[92] JX 32; Tr. 82-84 (Stansbury); Tr. 428-31 (Stovall).

[93] Tr. 82-86 (Stansbury).

[94] *See, e.g.*, JX 44; JX 56; JX 60; Tr. 237-38, 204-41 (Stansbury).

[95] JX 49; 211-14 (Stansbury). Metzger is the lead salesperson for mGage on the Cumulus Media account. He now reports to Stansbury. Tr. 556, 560-61 (Metzger).

[96] Tr. 114, 217 (Stansbury).

With Stansbury's help, Metzger reached out to various stations owned by Cumulus Media.[97] Stansbury actively gathered information about the services and pricing Hipcricket offered to Cumulus Media to assist Metzger in his efforts,[98] including information about Cumulus Media station contracts with Hipcricket and messaging volume that he "pulled together."[99] Metzger testified that mGage was able to successfully obtain business with KRBE, a Cumulus Media station located in Houston,[100] which he hoped would result in future business for mGage with Cumulus Media.[101]

### 4. Long John Silvers

Long John Silvers was a Hipcricket mobile messaging client that Stansbury serviced during his employment with Hipcricket.[102] On March 17, 2015, in response to a request from Aimee U'Sellis at Long John Silvers, Stansbury e-mailed her an executable version of a master services agreement with mGage.[103] Stansbury followed up with multiple e-mails to Long John Silvers in an effort to

---

[97] Tr. 214, 217-18, 221 (Stansbury); Tr. 570-72, 582-83 (Metzger).

[98] JX 65; JX 66; Tr. 215 (Stansbury); Tr. 584-591 (Metzger).

[99] JX 65; Tr. 215-16.

[100] Tr. 552-53 (Metzger).

[101] Tr. 598-99 (Metzger).

[102] JX 18.

[103] JX 23; Tr. 194-96 (Stansbury).

obtain their business.[104]   mGage was aware of these solicitations and pushed Stansbury to close on a contract with Long John Silvers before the end of the first quarter of 2015.[105]

### 5. Digitas

Stansbury worked on the Digitas account while at Hipcricket.[106]   Digitas completed the automated lead system on mGage's website and requested a proposal from mGage.[107]   In an e-mail dated April 14, 2015, Stansbury sought to be in control of, and assumed responsibility for, this account because he "worked with Johnathan [Digitas' contact person] on several projects at Hip."[108]   Stansbury was assigned the lead and responded to Digitas' request.[109]

### 6. MGM/Mandalay Bay

Stansbury was not responsible for the MGM account while he was employed at Hipcricket.[110]   On April 1, 2015, a number of MGM employees received and responded to Stansbury's form e-mail announcing his arrival at

---

[104] JX 28; JX 112; JX 122; Tr. 196-97, 199-202 (Stansbury).

[105] JX 31; Tr. 197-98 (Stansbury).

[106] JX 18; Tr. 202-203 (Stansbury).

[107] Tr. 107 (Stansbury).

[108] JX 53; *see also* JX 54; JX 68; Tr. 204-07 (Stansbury).

[109] JX 53; Tr. 107-09 (Stansbury).

[110] Tr. 100 (Stansbury).

22

mGage.[111]  Despite being informed that MGM/Mandalay Bay was "very happy with the services and partnership provided by Hipcricket,[112] Stansbury continued to send e-mails later in April and early in May to Lou Ragg, a former MGM employee, to attempt to set up a meeting.[113]

### 7. Virginia Lottery

Virginia Lottery was one of the largest accounts Stansbury serviced while he was with Hipcricket.[114]  mGage put a team together to respond to an RFP that Virginia Lottery issued in July 2015.[115]  Stansbury was part of this team along with a salesman, account managers, and many other persons.[116]

\* \* \* \* \*

As of trial, Hipcricket had not lost any of the accounts discussed above to mGage, although Hipcricket claimed that it was forced to renegotiate its contract with and make significant price concessions to iHeart because of mGage's solicitations with Stansbury's assistance.  Hipcricket also claims that it learned at

---

[111] JX 34 JX 37; JX 41; Tr. 208 (Stansbury).

[112] JX 34.

[113] JX 71; JX 94; Tr. 209-10 (Stansbury).

[114] Tr. 164 (Stansbury).

[115] Tr. 120 (Stansbury).

[116] Tr. 120, 251 (Stansbury).

trial that defendants' actions impacted its relationships with other customers, such as Virginia Lottery and Cumulus Media.[117]

## I. mGage Interviews and/or Hires Former Hipcricket Employees

Hipcricket accuses Stansbury of violating the Commission Agreement by soliciting several of its current and former employees. The record shows that Stansbury had contact with several such employees, but that in each case the Hipcricket employee initiated contact with Stansbury, whose only involvement was to refer the individuals in question to mGage's human resources department:

- Lindsey Houser, a former Hipcricket Account Director, contacted Stansbury in March 2015 to see "if there were any opportunities at mGage." Stansbury referred her to human resources at mGage. Houser left Hipcricket on August 14, 2015. She received an offer from mGage on September 1, 2015, which she accepted.[118]

- Tracey Dreby was a former Hipcricket Account Director who worked on several accounts with Stansbury, including FordDirect, Team Detroit, and Virginia Lottery. While still a Hipcricket employee, she reached out to Stansbury about potential employment at mGage. Stansbury "referred her immediately" to mGage's human resources department. mGage made an employment offer to Dreby on May 7, which she accepted, and her last day with Hipcricket was on or around May 22, 2015.[119]

---

[117] Pl.'s Post-Trial Reply Br. 26.

[118] Tr. 320-26 (Houser); Tr. 136-37 (Stansbury).

[119] PTO ¶ 7; JX 18; JX 128; Tr. 33-34, 38, 138 (Stansbury); Tr. 436 (Stovall).

- Kim Donaldson, a former Hipcricket salesperson, asked Stansbury about employment at mGage. Stansbury referred her to mGage's Vice President of Sales, Scott Lancaster. Although Donaldson met with Lancaster to discuss a position, mGage did not hire her.[120]

## II. PROCEDURAL POSTURE

On June 11, 2015, Hipcricket filed its original Verified Complaint together with a motion for a temporary restraining order (TRO) and preliminary injunction. In its TRO motion, Hipcricket sought, among other things, (i) to enjoin mGage from soliciting customers using any evaluation material it had received from Hipcricket under a non-disclosure agreement in connection with mGage's due diligence of a potential acquisition of Hipcricket, and (ii) to enjoin Stansbury from violating the Commission Agreement by soliciting Hipcricket customers or using any of its confidential information.[121]

On June 17, 2015, I granted the TRO motion as to mGage, in part, but deferred ruling on the relief sought against Stansbury so that the parties could submit briefs addressing whether the Commission Agreement was enforceable given Hipcricket's bankruptcy filing.[122]

---

[120] JX 101; Tr. 261 (Stansbury).

[121] Dkt. 3 at 2.

[122] Dkt. 22; Tr. of Temporary Restraining Order H'rg at 76-77 (June 17, 2015). On November 30, 2015, the TRO against mGage was vacated after mGage returned all evaluation material to Hipcricket. Dkt. 104.

25

On July 16, 2015, after receiving additional briefing and hearing argument, I denied Hipcricket's motion for a preliminary injunction against Stansbury because Hipcricket failed to demonstrate a reasonable probability of success of proving on the merits that the Commission Agreement was enforceable.[123] In particular, I found based on the preliminary record that the Commission Agreement was an executory contract, and that Hipcricket had materially breached the Commission Agreement as of the petition date by not assuming its obligations, thereby excusing Stansbury from having to further perform under the Commission Agreement.[124]

On July 31, 2015, the Court entered a stipulated scheduling order setting this matter for trial beginning on November 2, 2015. On October 19, 2015, Hipcricket asked to bifurcate the trial to proceed as to liability and injunctive relief in November, and to address its request for damages at a later date. Hipcricket explained that the bulk of its damages claim involved its largest customer (iHeart) with which it was in the midst of renegotiating a contract, and that it expected that those "negotiations will be completed over the next couple of weeks."[125] On

---

[123] Tr. of Oral Arg. ("July 16 Tr.") at 79-80, 86 (July 16, 2015). Given the lapse of time since the June 17 hearing, I treated the motion as one for a preliminary injunction. *Id.* at 80.

[124] *Id.* at 85-86.

[125] Dkt. 73 at 2.

October 22, I denied Hipcricket's request to bifurcate the trial, but I postponed the trial by one month to allow Hipcricket to develop its damages theory.[126]

On October 20, 2015, after the close of fact discovery, Hipcricket filed a Verified Amended Complaint (the "Complaint"). It contains the following seven claims for relief:

(1) Breach of the Commission Agreement against Stansbury.

(2) Aiding and abetting a breach of the Commission Agreement against mGage.

(3) Civil conspiracy against mGage and Stansbury.

(4) Unfair competition against mGage and Stansbury.

(5) Violation of the Washington Uniform Trade Secrets Act against mGage and Stansbury.

(6) Tortious interference with business relations against mGage and Stansbury.

(7) Imposition of a constructive trust against mGage and Stansbury.[127]

On November 22, 2015, defendants filed a motion *in limine* to preclude Hipcricket from presenting proof of damages at trial using documents it did not produce to defendants until November 19.[128] I reserved judgment on defendants' motion *in limine*, allowing plaintiffs to present their damages theory at trial subject

---

[126] Dkt. 82; Dkt. 85.

[127] Compl. ¶¶ 29-64.

[128] Dkt. 95.

to having it stricken at a later time.[129]  On November 30, Hipcricket's corporate representative was deposed about Hipcricket's damages contentions.

Trial was held on December 1-2, 2015.  Hipcricket did not have a damages expert at trial and presented no formal evidence to support a case for monetary damages.[130]  Post-trial argument was heard on April 4, 2016.

## III.  LEGAL ANALYSIS

A threshold issue governing most of Hipcricket's claims is whether the Post-Employment Restrictions are enforceable given how the Commission Agreement was treated in Hipcricket's bankruptcy.  I address that issue first and then turn to the remaining claims.

### A.     The Post-Employment Restrictions Are Not Enforceable Because Hipcricket Rejected the Commission Agreement in Bankruptcy

Under the Bankruptcy Code, with certain exceptions not relevant here, a debtor in possession in a chapter 11 case "may assume or reject any executory contract" subject to the court's approval.[131]  The Third Circuit has defined an executory contract as "a contract under which the obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure

---

[129] Pre-Trial Conf. Tr. at 15 (Nov. 30, 2015).

[130] Stovall testified at trial about price concessions he claims Hipcricket was forced to make as a result of mGage's solicitations with Stansbury's assistance.  Tr. 404-15.  But this testimony was a far cry from a reliable form of damages analysis.

[131] 11 U.S.C. § 365(a).

of either to complete performance would constitute a material breach excusing the performance of the other."[132]

In denying Hipcricket's motion for a preliminary injunction against Stansbury early in this case, I held on a preliminary basis that the Commission Agreement was an executory contract. Hipcricket has not argued otherwise since.[133] To the contrary, the premise of its post-trial position is that the Commission Agreement was an executory contract that Hipcricket had the ability to assume or reject in the bankruptcy proceeding.[134] Thus, it is undisputed that the Commission Agreement was an executory contract.

Hipcricket also admits in its post-trial brief that it rejected the Commission Agreement in the Bankruptcy proceeding.[135] This conclusion logically follows from the fact that, although Hipcricket initially included the Commission

---

[132] *Cincola v. Scharffenberger*, 248 F.3d 110, 123 (3d Cir. 2001) (internal quotations omitted).

[133] By failing to argue in its post-trial brief that the Commission Agreement was not an executory contract, Hipcricket has waived that argument. *See, e.g.*, *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."), *aff'd*, 840 A.2d 641 (Del. 2003).

[134] *See* Pl.'s Post-Trial Op. Br. 44-45 ("the ultimate non-assumption of the Commission Agreement as part of Hipcricket's Amended Plan of Reorganization is of no moment"), 45 (accusing Stansbury of violating the Commission Agreement "*months* before Hipcricket rejected the Commission Agreement") & n.51 ("The fact that Stansbury resigned shortly after the Petition Date further renders the ultimate rejection of the Commission Agreement months later meaningless").

[135] *Id.*

29

Agreement in a schedule of contracts to be assumed as part of its Reorganization Plan, it amended the schedule to omit the Commission Agreement in response to Stansbury's objection.[136] The final Reorganization Plan approved by the bankruptcy court on May 14, 2015, specifically rejected all executory contracts that the company did not assume, including the Commission Agreement.[137]

The next question is: What is the legal effect of Hipcricket's decision to reject the Commission Agreement in the bankruptcy proceeding?

The Bankruptcy Code provides that ". . . the rejection of an executory contract . . . of the debtor constitutes a breach of such contract . . . immediately before the date of the filing of the petition. . . ."[138] The parties agree on this point of bankruptcy law.[139] Although federal bankruptcy law controls whether an executory contract has been breached by a debtor's rejection of the contract, "rejection does not affect the parties' substantive rights under the contract."[140] To

---

[136] JX 343 ¶ NN & n.4 (noting removal of "Objecting Employee Agreements" from the previous schedule of assumed contracts and unexpired leases).

[137] *Id.* ¶ MM ("Section 8.2 of the Plan provides for the rejection of all other executory contracts").

[138] 11 U.S.C. § 365(g).

[139] Pl.'s Post-Trial Op. Br. 42. ("rejection of a contract by the debtor is deemed a breach as of the petition date"); Defs.' Post-Trial Ans. Br. 28 ("When a debtor rejects an executory contract, the rejection constitutes a breach of such contract occurring immediately before the date the debtor filed its bankruptcy claim.")

[140] *Cincola*, 248 F.3d at 119 n.8 (3d Cir. 2001) (citing 3 *Collier on Bankruptcy* ¶¶ 365.09, 365.09[1] (Lawrence P. King ed., 15th ed. 1999); *see also In re Beck*, 272 B.R. 112, 120-

determine the legal the effect of a breach of a rejected contract, one must look to the applicable state law. The Second Circuit has explained this intersection of federal bankruptcy and state law as follows: "The Bankruptcy Code treats rejection as a breach so that the non-debtor party will have a viable claim against the debtor. However, the Code does not determine parties' rights regarding the contract and subsequent breach. To determine these rights, we must turn to state law." [141]

The Commission Agreement is governed by Washington law. [142] Under Washington law, a party in material breach of a contract may not demand performance from the non-breaching party. [143] Washington law further provides that a "material breach is one serious enough to justify the other party's

---

21 (Bankr. E.D. Pa. 2002) ("Rejection does not . . . affect the parties' substantive rights under the contract or lease, such as the amount owing or a measure of damages for breach.") (citing same section of *Collier* treatise ); *In re Fleming Cos., Inc.*, No. 03-10945, 2007 WL 788921, at *3 (D. Del. Mar. 16, 2007) ("[T]he Third Circuit has explained that rejection of an executory contract does not alter the substantive rights of the parties.") (internal quotation omitted).

[141] *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997).

[142] JX 1 § 3(g).

[143] *E.g.*, *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 317 P.3d 543, 550 (Wash. App. 2014) ("[I]f it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance by the other party is excused.").

abandoning the contract because the contract's purpose is defeated."[144]  In the employment context, Washington courts have expressed a "strong public policy in favor of ensuring that earned wages are paid,"[145] and found that an employer's breach of an employment contract excuses performance of a non-compete by an employee.[146]

In previously denying Hipcricket's motion for a preliminary injunction, I found that the amount of Stansbury's claim against the Company ($31,000) was material to him and that the company's failure to pay him this amount would constitute a material breach of the Commission Agreement.[147]  Hipcricket, which

---

[144] *Moore v. Blue Frog Mobile, Inc.*, 221 P.3d 913, 917 n.2 (Wash. App. 2009) (citing *Park Ave. Condo. Owners Ass'n v. Buchan Devs., L.L.C.*, 71 P.3d 692, 698 (Wash. App. 2003)).

[145] *Morgan v. Kingen*, 169 P.3d 487, 495 (Wash. App. 2007); *see also Schilling v. Radio Hldgs., Inc.*, 961 P.2d 371, 374-75 (Wash. 1998) ("The Legislature also established a remedy of exemplary damages if an employer willfully refuses to pay wages. . . . By providing for costs and attorney fees, the Legislature has provided an effective mechanism for recovery even where wage amounts wrongfully withheld may be small. This comprehensive legislative system with respect to wages indicates a strong legislative intent to assure payment to employees of wages they have earned.") (internal citations omitted).

[146] *See, e.g.*, *Parsons Supply, Inc. v. Smith*, 591 P.2d 821, 823 (Wash. App. 1979). Delaware law follows the same rule. *See, e.g.*, *Dickinson Med. Gp., P.A. v. Foote*, 1989 WL 40965, at *7 (Del. Super. Mar. 23, 1989) (excusing performance of non-compete obligations, finding material breach of employment agreement where "[t]he amounts involved . . . are not *de minimis,* and the payment of [employee's] compensation goes to the essence of this employment agreement.").

[147] July 16 Tr. at 82.  This preliminary finding was based on representations Stansbury's counsel made that his annual compensation from Hipcricket ranged from about $100,000 to about $200,000. *Id.* at 32.

had the opportunity to explore this issue in discovery and at trial, does not contend otherwise. I independently find that the amount in question was material to Stansbury based on the trial record, which indicates that $31,000 constituted over ten percent of his 2015 compensation.[148]

Given the materiality to Stansbury of the amount in dispute, I conclude, based on a straightforward application of Washington law, that Hipcricket's breach of the Commission Agreement excused Stansbury from any further obligations he owed under that agreement, including the Post-Employment Restrictions, as of the date of the breach. As discussed above, the Bankruptcy Code deems the date of breach to be immediately before the Petition Date: January 20, 2015.

Hipcricket makes essentially three arguments for why the Post-Employment Restrictions should remain enforceable notwithstanding its rejection of the Commission Agreement in the bankruptcy proceeding. None of them has merit in my opinion.

First, Hipcricket argues that, as of the Petition Date, it did not "owe" any of the amounts sought in Stansbury's proof of claim and thus there was no breach of the Commission Agreement because they were not due to be paid to him until January 31, February 28, and March 31 of 2015.[149] As an initial matter, as

---

[148] Tr. 266-67 (Stansbury); *see also* Tr. 31-32.

[149] Pl.'s Post-Trial Op. Br. 41.

discussed further below, I see no equity in this argument given Hipcricket's assertion during the Bankruptcy proceeding that all of the amounts in Stansbury's proof of claim were "pre-petition" claims that were either "accrued" or "earned" before the Petition Date,[150] which caused those amounts to be classified as general unsecured claims rather than to be given administrative priority. Hipcricket also cites no legal authority to support the distinction it asks the Court to draw between an amount being "earned" and "owed." Ultimately, I need not resolve this issue because, as discussed previously, the conceded legal effect under the Bankruptcy Code of Hipcricket's decision to reject the Commission Agreement is that it is *deemed to have been breached as of the Petition Date*.

Second, relying on the proposition that executory contracts "remain in full force and effect up to, and until, the time the debtor assumes or rejects such contract," Hipcricket complains that Stansbury violated the Post-Employment Restrictions by soliciting its customers "before Hipcricket rejected the Commission Agreement."[151] The problem with this argument is that Hipcricket took no action to enforce its rights during this period. Had it done so, it may have been entitled to relief. But it did not. Hipcricket instead waited until June 11 to file this action,

---

[150] JX 25 at HC000154 (noting that the $9,427 in paid time off was "accrued pre-petition" and that $21,404 in commissions were "earned pre-petition"). *See also* JX 24; Tr. 460, 465 (Bradford).

[151] Pl.'s Post-Trial Op. Br. 44-45 & n.50 (citing authorities).

after it already had elected to reject the Commission Agreement, which, to repeat, caused a breach of the agreement as of the Petition Date as a matter of bankruptcy law and rendered it unenforceable under Washington law as of that time, before any of Stansbury's alleged breaches.

Third, citing several cases involving debtor franchisees, Hipcricket argues that "post-termination obligations within executory contracts remain enforceable even *after* rejection by a debtor in bankruptcy."[152] This line of cases, for which there is a split of authority,[153] is inapposite. All of the franchise cases Hipcricket relies on dealt with the question of whether a *debtor's* obligation not to compete survived *its own rejection* of the contract containing that obligation. In each of those cases, under black-letter bankruptcy principles, the debtors breached the contracts by rejecting them. It is sensible and equitable that a breaching party should not be excused from *its own* non-compete obligations just because it breached the contract. Here, by contrast, it is the breaching debtor who is seeking to enforce contract rights that it refused to pay for by assuming the contract. Just

---

[152] *Id.* at 47-48 (citing *Jackson Hewitt Inc. v. Childress*, 2008 WL 834386, at *9 (D.N.J. Mar. 27, 2008); *Sir Speedy, Inc. v. Morse*, 256 B.R. 657, 659-60 (Bankr. D. Mass. 2000); *In re Steaks to Go, Inc.*, 226 B.R. 35, 37-38 (Bankr. E.D. Mo. 1998); *In re Klein*, 218 B.R. 787, 790-91 (Bankr. W.D. Pa. 1998)); *see also* Pl.'s Post-Trial Reply Br. 13 (citing *In re Don & Lin Trucking Co., Inc.*, 110 B.R. 562, 568 (Bankr. N.D. Ala. 1990)).

[153] *See, e.g.*, *In re Rovine Corp.*, 5 B.R. 402, 404 (Bankr. W.D. Tex. 1980); *see also In re Annabel*, 263 B.R. 19, 23-24 (Bankr. N.D.N.Y. 2001) (examining different lines of cases dealing with debtor rejection of non-compete agreements arriving at opposite results).

as it was inequitable in the franchise cases for the debtors to benefit from using bankruptcy to avoid their obligations, it would be inequitable here to allow Hipcricket to enforce a contract that it materially breached.

In a broader sense, Hipcricket's position would lead, in my view, to a result inconsistent with the policy of the Bankruptcy Code concerning executory contracts. The purpose of affording a debtor the option to assume or reject executory contracts is to allow the estate to assume beneficial contracts and to reject contracts that are less favorable.[154] This choice essentially equates to a decision to perform or to breach.[155]

The debtor's decision to perform or breach has significant consequences for both the debtor and the creditor. If the debtor chooses to breach, the creditor's claim typically becomes an unsecured claim against the estate that is treated *pro*

---

[154] *In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993) ("The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'") (quoting 2 *Collier on Bankruptcy* ¶ 365.01[1] (15th ed. 1993); *see also* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding 'Rejection'*, 59 U. Colo. L. Rev. 845, 847-49 (1988) ("Assumption permits the estate to obtain the benefits of continued performance by the nondebtor party to the contract, as would assumption by an ordinary contract assignee. . . . [R]ejection is not the revocation or repudiation or cancellation of a contract or lease, nor does it affect contract or lease liabilities. It is simply a bankruptcy estate's decision not to assume, because the contract or lease does not represent a favorable or appropriate investment of the estate's resources.").

[155] Jay L. Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn. L. Rev. 227, 231 (1989) ("The trustee has the choice of 'assuming' a pre-bankruptcy contract or 'rejecting' it. These are merely bankruptcy terms for performance or breach.")

*rata* with other unsecured creditors, and usually yields little or no value.[156]  By contrast, if a debtor elects to assume the contract, it can only gain the benefits of that contract by agreeing to give administrative priority to the countervailing burdens, which usually means paying the creditor in full.[157]  As the United States Supreme Court has stated, "[s]hould the debtor-in-possession elect to assume the executory contract, . . . it assumes the contract *cum onere*"—meaning with the burdens that come with it—"and the expenses and liabilities incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate."[158]

Here, Hipcricket rejected the Commission Agreement in May 2015 by removing it from its list of assumed contracts, and the bankruptcy court confirmed its Reorganization Plan on that basis.  Significantly, Hipcricket knew when it

---

[156] *Id.* at 252-53 ("The principle that modifies the trustee's position, making it much more favorable than that of the pre-petition debtor, is equality of distribution.  That principle requires that all creditors be treated equally, subject to a number of important exceptions.  It apparently is the most universal of all insolvency principles throughout the world.  From the equality principle comes the rule of pro rata distribution to pre-petition unsecured creditors.  The pro rata rule requires that unsecured creditors share proportionately in distributions, with the result that almost never are they paid in full.  Their claims are calculated in full under state law, . . . but their actual relief, the payment of the claims, can be thought of as being in little tiny Bankruptcy Dollars, which may be worth only ten cents in U.S. dollars.") (citations omitted).

[157] *Id.* at 253 ("In sharp contrast, if the trustee assumes a contract, then it is converted into an estate obligation, a post-petition obligation, and the Other Party becomes entitled to full performance or payment as an administration claim.  Because administration claims are paid first in any distribution, they are usually paid in full, 100 cent U.S. dollars.").

[158] *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984).

rejected the Commission Agreement (1) that Stansbury had resigned from Hipcricket and joined a competitor (mGage); (2) that the Commission Agreement contained the Post-Employment Restrictions, which Hipcricket had invoked against Stansbury in a cease-and-desist letter it sent him on April 15;[159] (3) that Stansbury had filed a proof of claim on April 30 for amounts Hipcricket deemed to have been earned or accrued pre-petition, and which were indisputably "owed" by that date; and (4) that Stansbury objected to Hipcricket assuming the Commission Agreement as part of the Reorganization Plan without paying his claim in full. With this information in hand, Hipcricket made a conscious decision to reject the Commission Agreement, relegating Stansbury's claim to general unsecured status. In my opinion, Hipcricket's plea to "have its cake and eat it too" by demanding the ability to enforce the Post-Employment Restrictions without accepting the burdens associated with the Commission Agreement (*i.e.*, giving Stansbury's claim administrative priority so it would be paid in full) is not only contrary to the letter of the law, but would contravene in an inequitable manner the policy behind the optionality the Bankruptcy Code affords debtors with respect to executory contracts.

---

[159] JX 58.

**B. Defendants Are Entitled to Judgment on All Claims Premised on the Unenforceable Commission Agreement**

For the reasons explained above, I have concluded that the Post-Employment Restrictions in the Commission Agreement are unenforceable.[160] Consequently, defendants are entitled to judgment in their favor on each of Hipcricket's claims that are premised on establishing a breach of those provisions. In my opinion, five of the seven claims in the Complaint fall into this category.

Claims 1 and 2 assert, respectively, that Stansbury breached the Post-Employment Restrictions in the Commission Agreement and that mGage aided and abetted the breach of those provisions.[161] Thus, both of these claims are plainly premised on establishing a breach of the Post-Employment Restrictions.

Claim 3 asserts that defendants conspired to solicit "Hipcricket customers and employees in violation of the [Commission] Agreement."[162] Claim 4 asserts that defendants unfairly competed with Hipcricket by "continuing to violate the [Commission] Agreement."[163] Claim 6 (tortious interference with business

---

[160] Because I have found the Post-Employment Restrictions to be unenforceable by virtue of the bankruptcy proceeding, I do not address defendants' arguments challenging the reasonableness of those restrictions under Washington law.

[161] Compl. ¶¶ 30-31, 34-35.

[162] *Id.* ¶ 38.

[163] *Id.* at ¶ 45. Hipcricket argues that, separate and apart from any breach of the Commission Agreement, defendants unfairly competed with Hipcricket by making use of trade secrets to solicit its customers. *See* Pl.'s Post-Trial Op. Br. 54-56; Pl.'s Post-Trial

relations) asserts that defendants "communicated with various customers of Hipcricket in violation of the [Commission] Agreement and without the consent or permission of Hipcricket in an effort to damage Hipcricket's relationships with such customers."[164]    Thus, each of these three claims also is premised on establishing a breach of one or more of the Post-Employment Restrictions.

Because the contractual provisions upon which claims 1-4 and 6 are each premised are unenforceable for the reasons explained above, judgment will be entered in defendants' favor with respect to each of these claims.  I next address Hipcricket's remaining two claims.

## C.    Defendants Violated the Washington Uniform Trade Secrets Act

Claim 5 of Hipcricket's Complaint asserts that defendants violated the Washington Uniform Trade Secrets Act through Stansbury's misappropriation of Hipcricket's confidential information and use of such information during his employment with mGage.  This claim provides an independent basis for relief that is not dependent on the Commission Agreement.  As the Washington Supreme Court has explained:

---

Reply Br. 30.  This aspect of Claim 4 is duplicative of Hipcricket's claim under the Washington Uniform Trade Secrets Act (Claim 5).  As the Washington Supreme Court explained in *Ed Nowogrowski Ins., Inc. v. Rucker,* "[o]nce a common law concept, trade secret protection is now governed by statutes in most states, including Washington."  971 P.2d 936, 945 (Wash. 1999) (en banc).  Accordingly, I address this aspect of Claim 4 in the context of adjudicating Claim 5.

[164] Compl. ¶ 57.

As a general rule, an employee who has not signed an agreement not to compete is free, upon leaving employment, to engage in competitive employment. In so doing, the former employee may freely use general knowledge, skills, and experience acquired under his or her former employer. However, the former employee, even in the absence of an enforceable covenant not to compete, remains under a duty not to use or disclose, to the detriment of the former employer, trade secrets acquired in the course of previous employment. Where the former employee seeks to use the trade secrets of the former employer in order to obtain a competitive advantage, then competitive activity can be enjoined or result in an award of damages.[165]

Under the Washington Uniform Trade Secrets Act, any "actual or threatened misappropriation" of a "trade secret" may be enjoined.[166] The term "misappropriation" is defined in the statute as follows:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

> (i) Used improper means to acquire knowledge of the trade secret; or

> (ii) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was (A) derived from or through a person who had utilized improper means to acquire it, (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

---

[165] *Nowogrowski*, 971 P.2d at 941-42.

[166] Wash. Rev. Code § 19.108.020.

(iii) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.[167]

The term "trade secret" is defined in the statute as follows:

. . . information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[168]

Applying this definition, one court has explained that to succeed on a trade secret claim under Washington law, "a party must establish (1) that the information derives independent economic value from not being generally known or readily ascertainable to others who can obtain economic value from knowledge of its use and (2) that reasonable efforts have been taken to maintain the secrecy of the information."[169]

I conclude from the evidence at trial that Stansbury, with mGage's encouragement and participation, misappropriated trade secrets in violation of the Washington Uniform Trade Secret Act on at least three occasions.

---

[167] *Id.* § 19.108.010.

[168] *Id.*

[169] *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1200 (E.D. Wash. 2003).

First, in late March-early April 2015, Stansbury provided members of the mGage team who were preparing a proposal for Ford with two internal Hipcricket documents: (1) a document from Hipcricket's "JIRA" system containing technical information about past projects Hipcricket did for Ford,[170] and (2) an "upsell" Stansbury was "working on with Ford Direct" while he was at Hipcricket, which he believed would provide some insight into "where they are headed."[171] The latter document bore a copyright stamp in Hipcricket's name and was labeled "Confidential and Proprietary."[172] The documents were provided in response to a March 28 e-mail from Citron, mGage's Chief Revenue Officer, who asked Stansbury to "please share any & all documents (i.e., flows, etc.) that you think will be helpful" for preparing mGage's proposal to respond to a Ford RFP, which Citron characterized as "our biggest new Q2 revenue opportunity in the US."[173] I find it inexplicable that Stansbury did not know where these documents came from, and I do not credit his testimony in that regard.

Second, I find that Stansbury passed along to mGage information he obtained from Hipcricket's Salesforce database. This is borne out by an April 20,

---

[170] JX 32.

[171] JX 33.

[172] *Id.*; Tr. 432 (Stovall).

[173] JX 209; Tr. 81-86 (Stansbury).

2015 e-mail Stansbury sent to Metzger, who was in charge of soliciting business from Cumulus Media for mGage, with a copy to Citron. In the e-mail, Stansbury states he is providing "some intel" that was "all pulled together from SF," an obvious reference to Salesforce.[174] The information appears to reflect Hipcricket's annual billings and messaging volumes for "four contract groups" concerning Cumulus accounts.[175] Using that information, Stansbury and Metzger discussed how to best price a proposal for mGage to pitch to Cumulus.[176]

It is not entirely clear how Stansbury accessed the Salesforce database. It is undisputed that he transferred a significant number of files to his Hightail account from Hipcricket's Salesforce program the same day he learned about its bankruptcy filing, and that he reached out to mGage's CEO shortly thereafter to explore employment with mGage.[177] Given this timing and the circumstances, I am skeptical about Stansbury's claim that he never looked at, opened or downloaded any of these materials. When pressed on cross-examination, moreover, Stansbury admitted he was able to access his Hightail account after

---

[174] JX 65. Stansbury's testimony that he did not know what "SF" stood for in this context is simply not credible. *See* Tr. 216 ("Q. . . . is SF sales force? A. I don't -- I don't know. I -- Q. In your experience, what does SF stand for? A. San Francisco. Q. So you had spoken with somebody in San Francisco? A. I don't know. It could be sales force.").

[175] JX 65; *see also* Tr. 216 (Stansbury); Tr. 589 (Metzger).

[176] JX 66; Tr. 218 (Stansbury); Tr. 591 (Metzger).

[177] *See supra.* Part I.E.

joining mGage.[178]  Ultimately, however, how Stansbury obtained access to information from the Salesforce database to assist mGage is not important because the documentary evidence clearly shows, in my view, that he did.

Third, in an April 23, 2015 e-mail, Stansbury provided Citron with a list of "short codes" from the Hipcricket platform that were used by iHeart.[179]  The e-mail reflects that the information came from a woman named "Tracey."  Stovall testified that Hipcricket treats the information on its platform as confidential, and explained credibly that the e-mail was referring to Tracey Dreby (first name spelled the same way as in the e-mail), who was a Hipcricket employee at the time but who joined mGage in May.[180]  Stansbury and mGage made use of this protected information in their solicitation of iHeart.[181]

---

[178] Tr. 159-60.

[179] JX 79.

[180] Tr. 433-36 (Stovall).  Stansbury claimed that a woman named Tracy Kunzi, an account manager at mGage, did the research to pull the short codes.  Tr. 177-78 (Stansbury).  But Kunzi's first name is not spelled "Tracey" and Stansbury professed not to know where she obtained the information from.  Stovall's explanation of the source of the information is more credible.

[181] Defendants argue that the short codes are not protected trade secrets because they are iHeart's information, not Hipcricket's, and were "derived from iHeart's analytics report which iHeart shared with mGage in order for iHeart to solicit a competing proposal to [Hipcricket's] proposal."  Defs.' Post-Trial Ans. Br. 54.  I disagree.  The analytics report that iHeart gave to Stansbury is labeled "© 2014 Hipcricket – Confidential and Proprietary."  JX 245.  The information in it was Hipcricket's, not iHeart's, irrespective of the fact that iHeart passed it along to Stansbury and mGage.  Under the Washington Uniform Trade Secrets Act, Stansbury at the very least had reason to know that that report was "derived from or through a person who owed a duty to the person seeking

45

Each of the three categories of information was valuable to Hipcricket, was not generally known or available to persons outside of Hipcricket, and was treated as confidential information within Hipcricket. Hipcricket took reasonable measures to protect the confidentiality of this type of information by having employees regularly sign agreements to protect trade secrets.[182] Stansbury himself signed several such agreements with Hipcricket over the years, and was undoubtedly well aware (and certainly should have known) when he passed along to mGage employees the documents and information described above that they had been obtained improperly without Hipcricket's consent. As such, Stansbury, with mGage's encouragement and participation, violated the Washington Uniform Trade Secrets Act.

For the reasons explained above, judgment will be entered in Hipcricket's favor on Claim 5. The proper remedy for defendants' violations in my view is to impose a permanent injunction to bar Stansbury and mGage from making any further use of Hipcricket's trade secrets as defined in the Washington Uniform

relief to maintain its secrecy or limit its use." Wash. Rev. Code. § 19.108.010(2)(b)(ii)(C). In any event, even if the short codes are not Hipcricket trade secrets, the misappropriation of either the Salesforce data or the Ford documents alone would support the relief granted herein.

[182] Tr. 381-82 (Stovall), *see also* Tr. 304-05 (Miller) (testifying that she signed a similar agreement when she started working at Hipcricket).

Trade Secrets Act.[183] In accordance with their rights under the statute, defendants may apply to the Court for termination of the injunction at such time as the relevant trade secrets cease to exist.[184] The parties are directed to confer on an appropriate form of implementing order that addresses all protected Hipcricket trade secrets without infringing on mGage's ability to compete in the ordinary course of business.[185]

### D. Imposition of a Constructive Trust Is Not Warranted

Count 7 of Hipcricket's Complaint seeks the imposition of a constructive trust over "[a]ny profits obtained by defendants as a result of their improper

---

[183] Wash. Rev. Code. § 19.108.020(1) ("Actual or threatened misappropriation may be enjoined."); *see also Boeing v. Sierracin Corp.*, 738 P.2d 665, 681 (Wash. 1987) (en banc) (awarding permanent injunction of further use of trade secrets where "potential harm to Boeing as trade secrets holder extends beyond a mere calculation of monetary damages" and "[f]ailure to enjoin present and future copying would be inequitable, allowing Sierracin to profit from use of its ill-gotten gains."); *Pac. Aerospace*, 295 F. Supp. 2d at 1219 ("A permanent injunction is warranted because of the apparent difficulty in calculating monetary damages arising from defendants' use of PAE's confidential customer information.").

[184] Wash. Rev. Code. § 19.108.020(1); *see also Boeing*, 738 P.2d at 682 (finding that statutory ability to seek termination of injunction mitigated appellant's argument that injunction was "perpetual and punitive.")

[185] *See, e.g.*, *Pac. Aerospace*, 295 F. Supp. 2d at 1220 ("What is problematic, however, is fashioning a permanent injunction which is detailed enough so defendants know exactly what is unlawful behavior, but which does not unduly and unfairly prevents [sic] defendants from conducting business. . . . The court will ask [plaintiff] to propose language to be included in a permanent injunction which addresses the court's concerns and defendants will be given an opportunity to comment upon the proposed language.").

actions."[186]  Hipcricket did not present any evidence at trial concerning ill-gotten profits mGage earned as a result of the violations of the Washington Uniform Trade Secrets Act, or otherwise.  Accordingly, there is no basis for imposing a constructive trust.  Judgment will entered in defendants' favor on this claim.

## IV.  CONCLUSION

For the foregoing reasons, judgment will be entered (1) in defendants' favor on Claims 1-4 and 6-7 of the Complaint dismissing those claims with prejudice, and (2) in Hipcricket's favor on Claim 5 of the Complaint, entitling it to a permanent injunction.  The parties are directed to confer and submit a form of final judgment within five business days of the date of this opinion.

---

[186] Pl.'s Post-Trial Op. Br. 63.

48